# EXHIBIT A

**Desha Jackson Law Group, LLC.**
**Attorney ID #014591996**
200 Daniels Way,
Suite 200
Freehold, NJ 07728
PH: 732-414-6663
FAX: 732-414-6660
djackson@dljlawgroup.com
**Attorneys for Plaintiffs Melissa Blount**

| | |
|---|---|
| MELLISA BLOUNT <br><br> Plaintiff <br><br> vs. <br><br> TD BANK NA, AMBER CARROLL, SCOTT LINDNER, RICK BECTEL, ET.AL., JOHN DOE'S 1-10, ABC CORPORATION 1-10. <br><br> Defendants | SUPERIOR COURT OF NEW JERSEY LAW DIVISION-CIVIL PART CAMDEN <br><br> DOCKET NO. CAM-L- <br><br> CIVIL ACTION <br><br> **COMPLIANT** |

# <u>RACE, CEPA, AGE DISCRIMINATION, HOSTILE WORK ENVIRONMENT</u>

## <u>PRELIMINARY STATEMENT</u>

Plaintiff brings this action pursuant to Conscientious Employee's Protection Act N.J.S.A. 34:19-8, Intentional Inflection of Emotional Distress and the New Jersey Law Against Discrimination Act, N.J.S.A. 10:5-1 et seq. to remedy the adverse employment action and discrimination perpetrated by TD Bank. Plaintiff also alleges a hostile work environment. Plaintiff contends the layoff was only retaliation against her because she performed a whistleblowing activity. She was also discriminated against by management and co-workers based on her race and age. Plaintiff asserts further, a hostile working environment was created by defendant due to their unlawful conduct. The defendant's punishment of Plaintiff for her complaints to upper management about how she was being treated caused her severe financial loss and to suffer major depression. We believe TD Bank is liable to Ms. Blount by violating the laws as stated.

1

## PARTIES

1. Plaintiff, Melissa Blount, an African American female who is over 45-years old, is a citizen of the Unites States and resident of the State of North Carolina.  At all times relevant to this suit, until her termination, she was employed with the TDB in New Jersey.

2. At all pertinent times, Plaintiff Melissa Blount resided at 1500 Yarrow Court Williamstown, NJ 08094 and 13808 Waltham Place Charlotte, North Carolina, 28227, when she worked for TDB.

3. At all pertinent times Defendant TDB headquarters is located at 1701 Route 70 East Cherry Hill, New Jersey 08034 and Two Portland Square, Portland, Maine 04112.

4. President and Chief Executive Officer at TDB America's Most Convenient Bank was Bharat Masrani. The current President and Chief Executive Officer is Gregory B. Braca.

5. Defendant will be referred to as the "TDB".

## STATEMENT OF FACTS

6. Melissa Blount, the Plaintiff, was an employee with the TDB for over 13 years. She worked in various positions during her tenure.  She is an African American.

7. Ms. Blount maintained offices in Mahwah, Cherry Hill and Mount Laurel, New Jersey during her tenure.

8. Throughout Ms. Blount's career with TDB, she received several awards including 2007 Fair Lending, TD Bank (TD Banknorth) Corporate Committee – Member ; 2008 Top Performer – Above and Beyond Award, TD Banknorth; 2009 Top Performer – Above and Beyond Award, TD Bank ; 2009-14 Serving Diverse Communities, TD Bank Corporate Diversity Subcommittee – Member; 2011-14 National Community Reinvestment Coalition – Mortgage Finance Committee Member; 2012 Retail Lending WOW Star – Corporate Award for Excellence; 2013 Wow Award – Partnership – from Risk; 2019 Wow Certificates for Outstanding Work from – Compliance for the Home Mortgage Disclosure Act (HMDA) Project and Community Relations for the Financial Literacy Project.

9. Ms. Blount's protected activity was her telling Ms. Amber Carroll, her manager of her concerns regarding National Sales Director Scott Linder's giving early product access to the mortgage loan officers, which she believed violated Regulation Z of the Truth and Lending Act among other rules, regulation and policy. The Sales Director's actions resulted in the approval of the origination of two loans in October of 2019, which caused loan officers payments to be out of scope for the existing 2019 compensation plan.  The new 2020 Mortgage Loan Officer Compensation Plan would allow the activity but would

2

only for loans originated in the 2020 fiscal year.  This activity occurred prior to the start of the new plan, which meant the Mortgage Loan Officer were being asked to work without hope of compensation.

10. On October 17, 2019, Ms. Blount called Human Resources (HR), Paul Shima to confirm her assessment and ask if she missed anything.  Ms. Blount was told that this manager got his hand smacked for this same thing a year ago.  HR said to Ms. Blount, let's see how this plays out.

11. Ms. Blount went on vacation the following Monday to Wednesday in October of 2019 and returned on Thursday, October 24, 2019.  She received a call on her cell phone from Mr. Lindner saying he sent two emails regarding two projects she was working on.  Ms. Blount indicated she had seen them.  He then said, "and there was an Employee Loan originated, but it was no big deal because it would close after the Nov 1st."  Ms. Blount said "un-ha…so the MLOs know they will not get paid on these loans?"  He raised his voice and very firmly in a yelling voice said "they will get paid because the payout is after the start of the new fiscal year."  Again, Ms. Blount said un-hah.  She thanked him for calling and hung up.  She sent an Instant Message to HR telling them what had transpired.  She didn't receive a reply.

12. Ms. Blount was scheduled for a one-on-one meeting with her manager on the following morning, but it was changed to Wednesday, October 30, 2019. She was going to ask Ms. Carroll about Mr. Lindner approaching her about a confidential email she sent to Ms. Carroll, but Ms. Carroll started the meeting with, "Hi Melissa, I have Paul Shima here with me."  He was the human resource business partner.  Ms. Blount thought this could only be a layoff as she had not done anything to be put on a performance plan or to be terminated.  The reason they gave for the layoff was that they needed a Senior Project Manager due to the number of projects facing the departments. This reasoning was in direct opposition to what she heard earlier that day. Earlier that day, Ms. Blount heard that all Project Managers were going to be pulled into the PMO (Project Management Office) and there would be none in the business lines. So, a Senior Project Manager was really not going to be in the business line.

13. Ms. Blount was retaliated against by being laid off October 30, 2019, less than two weeks after performing the whistleblowing activity October 17, 2019. Ms. Blount was also the only person in Residential Lending/Mortgage Sales to be laid off at that time.

14. In the first week in November, Mr. Lindner repeatedly called Ms. Blount on her cell phone, harassing her, for two days.  Ms. Blount answered the first one and got so flustered that she addressed his concerns by email and wouldn't take any more of his cell phone calls.

15. He did say that the project she did on the Commitment Letter wasn't going to work for the field. He asked her how could she set the project trigger for the "clear to close stage" of a mortgage loan and not after the conditional approval stage?   Ms. Blount said that the action taken for the project was at his direction.

3

16. She was so flustered after that call that she sent him an email showing him where he gave her that directive back in May.  After this encounter, she asked him if he would send his future requests by email, she would reply as soon as she could.  After sending that message he had his assistant schedule a meeting for the following day.

17. It is highly suspect that Ms. Blount is criticized for work that Mr. Lindner instructed her to do earlier. He now tried to blame her for some imaginary shortcoming after he had her terminated for telling on him. This is also harassment.

18. Throughout her tenure with TD Bank, Ms. Blount was subjected to racial discrimination. She was moved without her consent or even a discussion at times, denied and blocked from jobs she was promised in another department for progression, given projects she had no experience in, assigned the largest geographic territory and numerous projects, called upon to work out issues at the last minute, expected to do several jobs at once.  No one else was moved around like her in her department, no white employees were treated this way.

19. In January 2018, Ms. Blount was removed from managing the MLO Training Bootcamp which she and her former manager created and was told that the new management team would not be rolling out the Training Institute; however, Matt Buganza, who was a white male, assigned to managing the Bootcamp.

20. Defendant returned her to handling audits, policies, procedures and all things governance, regulatory and compliance. Ms. Blount was again told that she was the only one with institutional information that could handle the role. Ms. Blount was also told by Ms. Carroll that she did not believe the function of governance and control belonged on her team and she would be seeking a new home for the role.

21. Returning to the roles in January 2018, Ms. Blount asked to get access to the Monthly Business Report (MBR), the Fraud Council, the Mortgage Loan Officer Dispute Council and to be alerted whenever there was some sort of Mortgage Operations issue so she could remain sharp. Ms. Blount was told ok, but it never happened.  She asked a few times to no avail.

22. She also looked at taking some Project Management Courses and discovered TD was only offering them in Canada.  Ms. Blount looked at Black Belt Training and found it was only being conducted in Canada.  She then found some Agile Project Management Training online and learned it was only available online to Canadian employees.

23. There was no internal opportunity to enhance her skill set at TD Bank. She was constantly told that they were functioning in a tight expense environment.   But interestingly enough, Ms. Blount noticed that Scott Cloney, a white male, Ms. Heather Spence and Ms. Carroll two white women all attended a couple of conferences.

24. Starting in July of 2008 Ms. Blount had the largest territory and as the bank acquired new markets, they were all assigned to Ms. Blount.

4

25. After the Commerce - TD Banknorth merger, new teammates joined the department. Ms. Blount, the Community Development Manager was asked to help train the new Community Relations Managers who were all white women. She went on joint calls with them and taught them how to evaluate the grant requests. The new head of Community Relations, Ms. Paula Wengerd told Ms. Beth Warn, the head of the division that space was limited, and they found a space for Ms. Blount with them.

26. Ms. Blount challenged the comment by asking the Regional President.  He said the space at the headquarters was hers as long as she wanted it.  Because her boss was on vacation, she did not have anyone to appeal to so, she went and sat with Community Relations for two days as she watched and listened.  They asked her about her emails and phone calls.

27. Ms. Blount told her manager, Mr. Lagueux head of Community Development about what happened when he returned.  He stated that they just wanted to watch her.  Ms. Blount returned to her seat at the headquarters.

28. Again, she was labeled as not being a team player by her white counterparts and managers.  It is mind boggling that her white counterparts believe she is not a team player because she did not want to give up a space she was entitled too.

29. In October of 2009, Ms. Blount applied for a new position at the suggestion of Mr. Jeffrey Burnham, VP, Residential Lending Manager - Northeast. After a second interview she told her supervisor Mr. Lagueux about the interview, he told her he was obligated to share the news with his manager Ms. Beth Warn.

30. Ms. Warn was not supportive of her in the past.  Ms. Blount has been forced to defend each accusation asserted by Ms. Warn which included she was aggressive, a lone wolf, not a team player and whenever anyone would say something about Ms. Blount to Ms. Warn, she sided with the other party.  Ms. Blount was afraid, Ms. Warn would tell other business partners rendering her ineffective in her current position so, she decided to withdraw her interest from the new position.  At that point in the interviewing process Ms. Blount was not convinced she wanted the new role. She was discouraged from taking the role.

31. In December of 2009, a Community Relations Manager told her congratulation is in order, Ms. Paula Wengard told her Community Relations team that Ms. Blount was leaving to go to Mortgage. Ms. Blount felt like she was being pushed out because the position had not been offered to her and she had not made a decision about taking the position.

32. In January of 2010, Ms. Blount was offered the position, but it was a grade lower, less money and a loss of her title.

33. She had to fight to obtain her desired salary because she would no longer be eligible for Restricted Stock Units. The stock offerings were given to Quality High/Exceptional rated employees and would payout within 3 years of the award as long as the employee stayed with the bank.

5

34. Mortgage Sales Department, Steve Kaminski told her I can't pay you what you are asking for because you would be making more than Jeff Burnham. He was a white male!

35. Ms. Blount was finally offered everything she asked for.

36. In November 2014, during her review, Malcolm Hollensteiner, a new head of Residential Lending, said he received a complaint from the Regional Sales Managers, who are mostly white men, that Ms. Blount was not a team player.

37. She responded with the nature of my job is very different than theirs. Their job was to grow the business, while hers was governance and control designed to keep everyone out of trouble.

38. Ms. Blount believed Mr. Hollensteiner spoke with the Risk Manager, Lisa Kinsman and asked her for her opinion because, Ms. Kinsman suggested that Ms. Blount become more involved with other TDB support groups like "Women In Leadership".

39. Before Ms. Blount started with these compliance efforts the department was a part of the Mortgage Operations Department.  There was a separation and Mortgage Sales became its own department whereby becoming responsible for writing its own policies and procedures.  It was now responsible for policing itself and Ms. Blount, a department of 1 became responsible for policies, procedures and all internal and external audits for the new department.

40. Ms. Blount was told that the sales team was a bunch of cowboys.  She heard that statement from several people who worked in different areas including risk, compliance, privacy, mortgage operation and legal and that they were happy she was there, putting structure in a team that had none. She was ensuring the law was adhered to.

41. In 2015, Kevin Gillen, a white male, became the new head of Mortgage.  Ms. Blount was acquainted with Mr. Gillen and knew of his reputation for using people. Under her previous role in Community Development.

42. In the Community Development roles, Mr. Gillen, then a Regional President asked her if she knew the President of the local Black owned bank in DC. She did not and later discovered the President of the Black Bank filed a complaint against Mr. Gillen with the President and CEO of TD Bank Financial Group Ed Clark (the TD holding company).

43. Early in Mr. Gillen's new role in Mortgage, the company had hired a firm to conduct a reorganization of TD Bank, Ms. Blount decided to apply for a Risk Manager I position, under Lisa Kinsman. She interviewed and accepted the position.

44. A few weeks later she was told she could not go to the risk department as she had too much institutional knowledge and that loss would harm the business. The newly defined mortgage department recasted her position as a level 10 and not an 11.

6

45. She did the math and figured out she was going to lose $7,000 that year with the change. She went to Mr. Gillen and explained her displeasure with the changes. She asked him to make her whole with the $7,000. He declined her request. It was her understanding that the request could have been granted by the head of the business line.

46. The change in salary affected how much she could make that year and for the foreseeable future. Ms. Blount already made more than grade that she was put into. So, the recasting meant she could never get another raise. The amount of potential bonus she was now eligible for was lowered and she was no longer eligible for restricted stock options.

47. In September of 2016 and November 2016, Ms. Blount participated in two of Mr. Gillen's management meetings where Ms. LarMoore, a black woman hired, in 2015 as the head of Sales Strategy and Support made presentations. Both times she was informing the team about rules relating to their actions. Ms. Blount noticed the Sales Management team made disrespectful remarks, like "why don't you tell us Michele what I can't do." Ms. Blount couldn't understand why they did not give the same treatment to the Risk partner, Lisa Kinsman (white woman) or to the Christine Speh the Compliance partner, who was also a (white woman), the same way. Mr. Bailey was named the next new head of Residential Lending in December.

48. Soon thereafter, Amber Carroll, a white female, was named head of Sales, Strategy, and Support. She had the same title as Ms. LarMoore. Ms. LarMoore was still working in the department when Ms. Carroll was placed above her with the same title. Mr. Bailey hired her before he left the bank. Shortly thereafter Scott Lindner, a white male, was hired as the National Sales Director and Rick Bechtel was hired as the next new head of Residential Lending. All of these people were white.

49. In October of 2017, Ms. LarMoore came to Ms. Blount and asked why she was allowed to work in Charlotte and not from New Jersey. She also asked if Ms. Blount knew why Ms. Erica Gauge – a Sales Support Specialist who was black and was also allowed to work from home. Ms. Blount said she was granted permission from Mr. Gillen and Erica Gauge (a black women) received prior approval to work from home.

50. Ms. Blount asked why she was asking, and she said Ms. Carroll asked her. Ms. Blount asked if she asked about anyone else on the team as others also worked from home. She said no. Ms. LarMoore, Ms. Gamble and Ms. Blount were the only black women on Ms. Carroll's team. Other white employees worked from home as well. Shortly after the new leadership joined the department Ms. LarMoore posted out to join another team leaving Ms. Blount as the highest ranking African American on the team.

51. Ms. Carroll, only asked why she and another black co-worker worked from home; nothing was said of any of the white employees who also work from home. Even though it was common practice for TD Bank employees to work from home due to limited office space, Ms. Blount was told by Ms. Carroll that TD Bank did not have a "Work from Home" policy. She stated this even though the sales support function is under Ms. Carroll that sets up loan officer to work from home on a regular basis and that Ms. Blount had given up her office twice for Mortgage Loan Officers and had to work from home each

time.

52. In February of 2018, Ms. Blount completed an audit review scheduled for three hours in only 15 minutes.   She was assigned a project that included the Wealth department.  The National Sales Director decided to cancel the project.

53. She suggested that he reach out to the head of Wealth so they could have a private conversation about the project.  The last thing he would want is for Wealth to find out the project was cancelled by reading meeting minutes.  Ms. Blount also shared that his predecessor also did something similar and Wealth went to the top of the house to complain.  His predecessor was ultimately reprimanded.

54. Her manager told her a few days later that her opinion was not welcomed, and she needs to keep her advice to herself. This was said even though she was moved back to the current position because her institutional knowledge was needed.

55. In November of 2018, during Ms. Blount's first performance review with Ms. Carroll, she raised issues that Ms. Blount thought were strange. First, she stated that she didn't think what Ms. Blount belonged on her team.  She said she wasn't sure where she belonged, but not on her team. Second, she stated that comments have been made to her that people don't always know where Ms. Blount was.  Ms. Blount asked did she miss a meeting?  Ms. Carroll said no.  Ms. Blount asked for specifics as she could not defend herself against vague comments.  She would not give specifics.

56. She asked Ms. Blount to add hours of availability to her email signature.  It must be noted that Ms. Blount is the only person required to carry this information on her signature line.  The department does not work standard schedules, for example Ms. Carroll did not arrive to work until around 9am.  Ms. Blount started her work day at 7 am. Ms. Carroll then went on maternity leave and Ms. Blount reported to Scott Lindner in her absence.

57. This demonstrates that the institutional knowledge reason for her staying in the position was a hoax and pretext for discrimination.

58. The City of Philadelphia wanted a meeting because they understood that Commerce/TD Bank had announced a Community Reinvestment Act multi-million commitment to the State of New Jersey.  It outlined how much the new bank was committing to provide to qualified businesses and residents in New Jersey in the following areas: Loans, Commercial lending, Small Business lending, Residential Mortgage lending to Low to Moderate Individuals, Investments: (grants, sponsorships and investments and Service activities), opening and closing of branch locations, financial literacy and community board service.

59. The City of Philadelphia wanted an agreement for their city.

60. The Regional President, Michael Carbone, the head of Community Development, Dennis Lagueux, head of Community Development and Relations, Beth Warn, Greater Philadelphia Market President, Ron Matthew, and other senior regional leadership had

8

several meetings to strategize on the issue.  They included Ms. Blount in 1 meeting prior to the meeting with the City of Philadelphia.

61. They did not provide Ms. Blount with any of the meeting materials.  The day of the meeting, the Mayor Michael Nutter sat at the head of the table and all of his directors sat to his right.  The TD Bank participants Mr. Carbone, Mr. Lagueux, Mr. Matthew and others sat at the left; Ms. Blount took the only other seat available at the other end of the table across from the Mayor.

62. Again, Ms. Blount was not provided with any material to prepare for the meeting with Mayor Nutter, so she had a blank pad of paper in front of her.

63. The Mayor asked what was TDB prepared to do in the City of Philadelphia as it related to CRA?  He then asked if anyone even knew what programs the city had, was either Commerce or TD Banknorth active with any of them and were they – the new bank planning to continue to support the housing and economic development activities in Philadelphia.  The room grew quiet.

64. Ms. Blount asked the TD Bank leadership if she may speak and they allowed her to speak.  She outlined the community and economic development activities the city was engaged in, including a run-down of the activities both Commerce and TD Banknorth participated in.  She then went on to tell the mayor that he was engaging in a new neighborhood driven plan that was launched in Rochester, New York 7 years prior and St. Louis, Missouri 5 years prior.  Ms. Blount explained that the program had its successes and challenges and that TD Bank was at the table as a partner with the city directors as they planned to roll the program out.

65. The mayor looked at Ms. Blount for a long time and did not say anything.  He then took a deep breath and said he wanted to officially welcome TDB to the City and that he looked forward to a long partnership together.

66. Everyone thanked everyone and the TDB contingency departed.

67. The Regional President asked Ms. Blount and Mr. Lagueux if they could join him for lunch and that is where he shared that Ms. Blount just saved the financial relationship with the City of Philadelphia which amounted to about ¾ of a billion dollars.

68. This is when he offered Ms. Blount an office at the company's headquarters in Cherry Hill, New Jersey and one at the central market offices in Philadelphia.

69. Plaintiff believes was again being set up to fail at the meeting with the City of Philadelphia when she was never fully briefed about the issues prior to the meeting by her superiors.

70. This was deliberately done to her to humiliate her due to her race. She was being set up to fail.

9

71. Luckily, due to her superior talent and knowledge, she was able to answer the questions posed by Mayor Nutter and saved a ¾ of a billion dollars financial relationship for TDB.

72. In or around September of 2006, Ms. Blount was then asked to join the local South Jersey Senior Commercial Lender, Tony Fideli, on a call with the Jewish Federation and a Not-for-Profit Fair Share Housing Development (FSHD) Founder and Executive Director Peter J. O'Connor.  FSHD built affordable homes.  She agreed.

73. When she was at the Jewish Federation, the President of the Federation separated Mr. Fideli and Ms. Blount to have a private conversation with Ms. Blount.  He asked her if she knew where she was.  Ms. Blount said, she didn't know what he was referring to.

74. He said since she was new to the region, he felt it was his obligation to share local market information with her.  He showed Ms. Blount some papers that talked about the hate groups and all of their activity in South Jersey.

75. The documents indicted that the KKK had a strong hold in South Jersey.  It also said that South Jersey was ranked 3rd in the country by the FBI for racial hate crimes.  He just wanted her to know.  Ms. Blount was stunned.

76. Mr. Fideli and Ms. Blount then went to the 2nd call and met over lunch with Mr. O'Connor the CEO of Fair Share Housing Development.   They got along wonderfully.  He asked her about her background and she told him that she spent a little time at Harvard.  He said she should come and work for him, but then quickly said that he probably couldn't afford her.  They laughed.

77. On the ride back to the office, Mr. Fideli the Senior Loan Officer asked why he didn't know she went to Harvard.  She said it wasn't important.  He said something like yea the local market probably wouldn't embrace it.  She took that to mean her background would not be embraced with the local markets as they would probably think she would try to out-think them or challenge their directives.

78. The regional meetings were usually heavily filled with white men and few white women who normally managed the retail branches.

79. In or around October of 2006, Ms. Blount was in Philadelphia for a sponsorship/grant meeting with the local market and was the only black person at the regional committee.  There was a request that came up to support Deerfield Township's Annual Town Fair.

80. Ms. Blount googled the request and discovered that the festival was sponsored by the KKK.   She thought that there was no way the Foundation's money or TD's money was going to support something like this.  How could they explain the KKK name on the same sign as the company's name?

81. After a long debate, this request, which had been supported for at least 5 years, was declined.

10

82. The local regional market was not happy with Ms. Blount.

83. Moreover, it is also suspect and possible evidence of a discriminatory motive that TD Banknorth and the institutions it acquired supported the KKK through the sponsorship of the Deerfield Township's Annual Town Fair for at least the last 5 years.

84. Why would a bank that supports the KKK have black people in high level positions anyway?

85. On numerous occasions during Plaintiff's career her Caucasian superiors and counterparts would say she was not a team player if she did not want to move her office or chair, take a pay cut, to cover Caucasian employees' shortcomings or do something that was not compliant with the rules.

86. Ms. Blount was forced into jobs, denied opportunities, treated unfairly, humiliated, harassed and moved numerous times due to her following the law during her tenure.

87. The white managers were saying that she was not a team player because she was doing her job. We submit that this is another form of retaliation.

88. It is clear based on these facts that the only team here was for white employees, not black employees.  Ms. Blount could never be part of the team, not because she was not a great employee, but because she was a black employee who played by rules and followed the law.

89. Ms. Blount came to understand she had the largest territory and was always the one assigned new markets and the most challenging tasks.  Nevertheless, her white counter parts blamed her for their shortcomings when she worked in the Mid-Atlantic region, they were angry because she did not want to give up her seat at her location that she earned. Further, her failure to overlook the violations of the law of the sales team was a problem for them, not wanting to take a pay cut or even seeking a promotion for herself were all issues for her white superiors and contemporaries.  We submit that if she were white no one would say these things about her at all. She would be a part of the team as a white person.  In fact, no black people at TD Bank were part of the team that white people say Ms. Blount did not belong to because there was no team for black people only whites in management It is our contention that the scrutiny that Ms. Blount was under was unlawful because it was based on her race.

90. Ms. Blount eventually gained the Mid-Atlantic market's trust as a skilled community development practitioner. She was asked to work on commercial deals and go on commercial sales calls. She was also requested to sit in on Credit Committee meetings to assist with explaining the mitigating factors in government funding streams.

91. In community development, you are tasked with working with five business lines: Commercial Lending, Small Business Lending, Mortgage, Retail and the Foundation to assist them in making their Community Reinvestment Act goals.

92. Two of the business lines, Small Business and Mortgage, had trouble meeting their goals so they said it was Ms. Blount's fault. Her Mid-Atlantic Mortgage and Small Business counterparts claimed she was not a team player. The manager who told Ms. Blount this was a Caucasian male. These two departments hadn't made their goal in many years. It is obvious that they wanted to deflect attention away from their shortcomings and blame the black woman.

93. Nevertheless, this comment was repeated to her manager, Mr. Lagueux from the Mortgage manager who was based in Maine. Ms. Blount pointed out to her manager that it was not from a lack of effort on her part and showed him the evidence. She explained that the Mid-Atlantic Region did not work the same way as their peers in the North Eastern states.

94. For instance, the North East markets had Mortgage Loan Officers and trained their Branch Managers in Mortgage Origination. This was not true in the Mid-Atlantic States. The Mid-Atlantic markets only had a "phone on the wall" to provide to customers who were interested in a mortgage. The phone was manned by PHH Mortgage Company, an external mortgage company who would try to talk customers into submitting a mortgage application.

95. Her manager agreed with her assessment.

96. Shortly thereafter, in or around March of 2007, she was called to the office of Wendy Suehrstedt, the Mid-Atlantic Regional President. When she arrived, she saw Tara Williams the Community Relations Manager was already there. Ms. Blount was asked by Ms. Suehrstedt to pick up all of the Foundation work since Ms. Williams would be helping the Regional President with a couple of special projects. In essence do both the Community Development and Community Relations job.

97. Ms. Blount asked if she would be receiving the Community Relations Manager's pay for that time? Ms. Blount also expressed the need for her to complete her own projects and meet her goals. She then stated that her manager would need to be brought into any conversation that redirected her efforts. She was told that since she already had to add her information into Gifts, the same system used by the Foundation, it should be, "no big deal" for her to complete tasks for both jobs.

98. She was also told that she needed to be more of a team player. This meant to not get paid for doing another job. Ms. Blount shook her head and walked out.

99. Ms. Blount contacted her manager, Mr. Lagueux, and shared what had just transpired. He said, "No." He stated that her job was to be the Community Development Manager not the Community Relations Manager. Ms. Williams would have to do her own job. He said he would speak with his manager, Beth Warn about this matter. After this meeting Ms. Williams tried hard to avoid Ms. Blount.

100. Additionally, during her tenure, Ms. Blount suffered a $7000 pay cut and lost stock options when she was forced to stay in a position and not allowed to go to risk

12

management.  Why did this happen? She was told that she could move to a certain position or stay in one because of her institutional knowledge on two occasions.

101. Yet when she gives the advice she is supposed to do as the inside regulator she is told to shut up or is belittled, harassed and humiliated by white employees and managers. They roll their eyes at her or blame her for their shortcomings and continue to say she is not a team player. This was not happening to any of her white contemporaries.

102. Ms. Blount was consistently undermined by her white supervisors including Ms. Beth Warn and Ms. Amber Carroll.  They were always setting her up to fail no matter how many projects she completed effectively.  Ms. Warn would undermine Ms. Blount at every turn.  She was not supportive of Ms. Blount in the past.   She gave her the task of completing 7 Performance Context (PC) writeups and provide a 15 min presentation on all including a Q&A section.  Her peers only had 3-4 PC writeups and only had to present 2 of their markets.  After the presentations were complete Ms. Warn says to Ms. Blount, "You really do know your markets."  Ms. Blount said "that's my job".

103. She has stated that Ms. Blount was aggressive, a lone wolf, not a team player whenever anyone would say something about Ms. Blount.  She had to repeatedly defend herself against these false accusations by these supervisors.

104. During a review, after having completed several projects including audits, Ms. Carroll states that the regulatory and control function does not belong in her unit.  As if Ms. Blount had any power to reassign herself to another division or a choice on what to work on at that time.

105. She also questioned Ms. Blount's whereabouts, but of course could not point to specific instances of when Ms. Blount was absent or missed an assignment or a meeting. Nevertheless, after this review, Ms. Blount was the only person required to put her available hours on her signature line.

106. The department did not work standard schedules, for example Ms. Carroll did not arrive to work until around 9am. Yet, the only black manager in her unit was called upon to do something none of her white counterparts had to do again with no justifiable reason.

107. Further, Ms. Blount was also told by Ms. Warn that she was too aggressive. Unfortunately, it is common knowledge in the black community that this is said to black women on regular bases by their white managers and contemporaries. It is simply not true. When black women do their job well with passion or zeal we are labeled "aggressive".  It is our contention that this is racist stereotype meant to demean and humiliate black women.

108. In another instance, it was severely humiliating when her white supervisor, Ms. Warn, told her what to call other black people when Ms. Blount was going to attend a meeting with black people.

109. At another time a white divisional manager told Ms. Blount that she would be happy with a new hire because he was a black. It is our contention that this was insinuated because the

13

new hire had no mortgage experience. Why else would she be happy about him being hired?

110. It is also telling regarding the mortgage position, which Ms. Blount was forced to take, the manager indicated initially that he did not want to pay Ms. Blount more than a white male. Ms. Blount had to justify her salary request based on her career and experience. White counterparts did not have to justify their salary requests.

111. Ms. Blount was consistently never shown any respect or courtesy that her white counterparts had with regard to her own career. She was forced to go to her jobs, be demoted, lose pay, and benefits.

112. All of the deliberate confusion created by her white superiors was simply race discrimination. No white people who worked with Ms. Blount were subjected to the same treatment as her. In fact, white people are allowed and permitted to do things blacks were not allowed to do.

113. Mr. Lindner, a white male, was only slapped on the wrist before for doing the same thing. He attempted to have a loan completed prior to the policy for payment to the loan officers was in effect a year before. He was not terminated for violating the law. Based on the facts submitted, we believe it was because he is white.

114. Even though she was being treated unfairly, Ms. Blount was able to complete every assignment with perfection. She was also able to adapt to new white managers or supervisors and completed whatever was given to her with no issues. Ms. Blount was a superior worker who performed above and beyond. Even when she was given a technology project, which was not her bailiwick, she out performed as usual.

115. She was almost always assigned several projects at once. Ms. Blount even saved a ¾ billion-dollar client relationship for the bank. Nevertheless, she is consistently questioned about her whereabouts, why she works from home, why she has certain projects and not fitting in, and told she is not a team player by her white supervisors and contemporaries regularly. This conduct demonstrates disparate treatment of Ms. Blount.

116. The neutral reason for the layoff is pretext for discrimination. There was no need for a layoff. Plaintiff could have been placed her in another position.

117. We surmise that after 13 years of service and commitment to this corporation she deserves a raise, promotion and should be placed anywhere she wants to go. This was not the plan though. The plan was, in part, to get rid of her due to her race.

118. The discriminatory intent is clearly demonstrated here because the highest-ranking Mortgage Sales black woman is the only one being laid off in her department!

119. Based on information and belief, black employees are not doing well in general. It is well known among the black people at TD Bank that blacks are told they are not going to move up to certain positions. There are over 750 executives in the US and only 19 are Black.

14

120. In the Mid-Atlantic Region alone, only two people are black out of a leadership team of about 30 business partners.  Moreover, there is only one black Executive Vice President for at least the past 5 years in a company that probably has well over 10,000 employees across the country and makes billions of dollars.

121. It is also well-documented that black people have a difficult time in management positions at TD Bank. They are sabotaged and not supported.

122. The black man, Jason Pole, was hired to assist with the mortgages for people with low to moderate income levels, left because he was being set up to fail. It is racial harassment and humiliating, when he was hired that it was insinuated that Ms. Blount would like him only because he was black.  Unfortunately, he had no mortgage experience.

123. Ms. Blount watched Michelle LarMoore, who was also in mortgage, a black woman, endure the same type of humiliation she did from Mr. Gillen, Mr. Bailey and other white employees when she was explaining the Federal, State and corporate rules to them. They laughed and made rude comments to her and rolled their eyes among other actions.

124. These people did not give the same treatment to the Risk partner, Lisa Kinsman, a white woman or to the Christine Speh the Compliance partner, who was also a white woman. Ms. LarMoore was put over Ms. Blount as a supervisor. The bank also hired Ms. Carroll at the same title of Ms. LarMoore.

125. It is our contention that Ms. Carroll's hire demonstrated that the bank had no intentions of keeping Ms. LarMoore in that position.  Based on information and belief, Ms. LarMoore went to another department. It is also noted that no one has stayed in the lead diversity and inclusion position for more than two years at this bank.

126. Plaintiff submits that there was an acceptance of not lending to low income people because the bank did not believe it was viable business to go after. Greg Tallmadge, head of Product and Pricing would say there was no way he was supporting the Community Reinvestment Act efforts because those loans were not as profitable to the bank as other loans and he was charged with making the bank as much money as possible.

127. These loans are mostly to black and Hispanic people.  However, it appears that this mentality of a white manager that works for the TD Bank is acceptable.  Ms. Blount heard him make this statement. It is our contention that this statement also demonstrates the discriminatory animus at this bank.   We are aware that TD Bank was not sufficient with lending to low income to moderate income individuals as required by law in the Community Reinvestment Act in markets particularly urban markets that were/are heavily majority minority.

128. The racial harassment and discrimination were pervasive and regular as explained above during her 13 years.  Ms. Blount was subjected to a recasting of her job so that she lost $7000 in pay, she was blocked from advancing to positions she wanted, she was forced in positions without her consent, when doing her job, she was called not a team player. Even

though it was her institutional knowledge was the reason she was assigned certain places; she was told to shut up when giving advice or disrespected or humiliated by her white supervisors and contemporaries.

129. Moreover, her reputation was damaged due to her white managers preventing her from growing. Her white supervisors and other employees lied stating no one really knows where she was etc., when there was no evidence that she missed anything including meetings or work. In fact, it is noted that Ms. Blount completed all projects she was allowed to finish to conclusion. There was never an issue with the substance of her work. No issues were indicated in any of her evaluations.

130. Further, TDB was supporting a program that the KKK supported as well and had managers saying that there is no profitable business in those low-income communities. Ms. Blount is also being told what to say to black people. She also lost pay, lost benefits, was denied promotable opportunities, lied upon regarding her work by white supervisors and contemporaries, always had to defend herself unnecessarily due to her white managers or employees' false accusations and she was always assigned the largest territory and the most assignments etc.

131. It also is noted that when Ms. Blount was brought back to compliance she was not included in meetings about the department; she was not placed back on committees or given access to systems she had before. She was ostracized. This too was part of the racial harassment and retaliation.  All of these instances demonstrate pervasive and regular racial harassment at TD Bank.

132. In June of 2019 the Plaintiff was given a project to "help get across the finish line."  The project was a technology initiative.  M. Blount indicated that her role had been governance and control and not technology and she had no experience leading a technology project. Ms. Carroll indicated that all of the heavy lifting had been complete and another team was going address the technical elements.  All that was to be done was taking the project through the new Vendor Management process.

133. Ms. Blount discovered that the project was much more involved than led to believe. She discovered the following: two vendors were involved not one and additional due diligence was needed for the 2nd, Canadian Legal would not approve a tri-party agreement, Project team would not approve a manual process due to the risk because the projected needed technology solutions $500k and a formal architect and technology buildout, Divisional Manager, R. Becktel approved the $ spend and told Ms. Blount she was the 5th person who had this project and she had gotten it farther than any of the others, 3PRM discovered technology deficiencies with the vendor which could allow bank customers personal, sensitive data to be compromised.

134. On 10/19/19 Ms. Blount put together an executive summary for R. Becktel and A. Carroll outlining the potential risk and presented it in October.  R. Becktel asked them to go back and figure it out.

16

135. Ms. Blount was able to make significant progress on the project by completing all steps in the new Vendor Management process which included corporate risk, compliance, privacy reviews, Technology review and approvals.  It also included Cloud Governance review and approval.  Due to the vendor's inability to provide a secure process ensuring TDB's customer personal private data would be protected the project recommendation was not to proceed with the initiative. Mr. Becktel introduced the relationship to TDB and was not happy with the final recommendation.

136. Ms. Blount did not have a technology background, asked for help and was denied and was set up to fail. She was the only one laid off in the mortgage department.  She was laid off "off-cycle" as the bank wide notices had gone out in the May/June time frame.  Ms. Blount was the only employee let go for failing to deliver this technology project.  Mr. Becktel acknowledged Ms. Blount was the 5th employee to work on the project and the only one who had gotten it that far.  The 4 other employees who worked on the project were white.

137. On 10/17/19 Ms. Blount sent a confidential email to her manager Ms. Carroll outlining what was believed to be a regulatory infraction caused by a senior level manger and if discovered it could cause the business line some issues.  It was in direct conflict with what was approved by the board of directors and what was reported to the Federal Government.  Ms. Carroll said let's pull Mr. Lindner into the discussion.  Ms. Blount indicated he was the infractor.  She asked Ms. Blount to conduct more research to determine the level of risk.

138. Ms. Blount then contacted Mr. Shima, HR Business Partner to confirm her assessment and asked if she missed anything. Mr.  Shima stated that this manager got his hand smacked for this same thing a year ago.  He said let's see how this play out.

139. Ms. Blount went on vacation for 3 days and returned to Mr. Lindner calling her about the email and raised his voice in an attempt to intimidate.

140. A few days later on 10/30 Ms. Carroll and Mr. Shima met with Ms. Blount to deliver the layoff communication to her.

141. The reason given for the "layoff" is pretext for discrimination. There was no need for the position they stated.  Thus, the neutral reason is untrue. Ms. Blount learned on 10/30/19 that Project Managers would be centralized in the PMO (Project Management Office) and not in the business lines.  This very fact made the rational for her layoff untrue.

142. At this time Ms. Blount was the longest tenured manager in the department and the highest-ranking black employee.

143. Ms. Blount was laid off in October when she was on the project for several months.

144. Based on information and believe layoffs are announced in the spring. They were

17

scheduled for spring of 2020 and had happened in spring of 2019.  Plaintiff was laid off in October 2020 not in line with spring layoffs as is the custom.

145.  The only black woman in her group at her level is being fired because she is black and not because of any other reason. The evidence clearly demonstrates a racial animus at TDB for many years against Ms. Blount.

146.  Black people were set up to fail at TDB.

147.  Based on information and belief, it was generally known that black people are not promoted into high level positions at TD Bank. TD bank has a history of having only one black in an Executive Vice President position.

148.  The few in senior level positions did not make it because they are not supported, but ridiculed and set up to fail. They are not given the right information, or humiliated, or demeaned.  Black people also leave due to the hostile work environment.  This is clearly what happed to Jason Pole.  We also see that Ms. LarMoore transferred out after being racially harassed and ridiculed by the white employees and management.

149.  TDB faired lowest in employee satisfaction among black women.  It is our understanding that the 2019 TD Bank employee satisfaction survey was rated the lowest in the company's history. The group giving the lowest rating was black women. This ranking could possibly be due to the fact that they are being racially harassed, marginalized and discriminated against. Maybe other black women face the same issues as Ms. Blount of being devalued, passed over for promotions, asked to train the white people who receive promotions and are under paid.

150.  At an offsite executive meeting in January of 2020. The following statement, "we need to treat our black people better" was made in the presence of the executive leadership and CEO.

151.  The Plaintiff is a superior, talented, experienced worker with no performance issues.

18

# FIRST COUNT

## CONSCIENTIOUS EMPLOYEE'S PROTECTION ACT

## N.J.S.A. 34:19-8

152. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the each and every aforementioned paragraph as though fully set forth herein.

153. Due to the Plaintiff performing a whistleblowing activity when she told Defendant Carroll, her supervisor/manager her concerns regarding Mr. Lindner violating Regulation Z of the Truth and Lending Act. Defendants retaliated against the Plaintiff by terminating her employment on October 30, 2019. This is an adverse action against her in violation of N.J.S.A. 34:19-8.

154. CEPA was created to protect workers who complain about illegal activity of their employers.

155. Reporting unlawful conduct including violations of the criminal code, federal, state, public policy and administrative laws is activity protected by CEPA.

156. Plaintiff had a reasonable belief that Defendant's actions violated Regulation Z of the Truth and Lending Act, which specifically deals with a mortgage loan originator's compensation requirements. Moreover, she was also concerned with violation of the wage hour law and the interference of improprieties his actions could raise to bank regulators and auditors.

157. Defendant 's claim that Plaintiff was lay off for other reasons are neither credible nor the true determinative factor in taking the adverse action against the Plaintiff.

158. The Defendant's true motivating reason for its adverse action was to retaliate against Plaintiff for her protected activity of whistleblowing. This is unlawful conduct under N.J.S.A. 34:19-8 (CEPA). TDB created a bogus neutral reason to fire the only black person in the department at her level or higher for doing her job-of reporting illegal activity.

159. A causal nexus exists as a result of Defendants violation N.J.S.A. 34:19-8 (CEPA) There was only a one-week period between the whistleblowing activity and termination on October 30, 2019. Plaintiff was told she was being laid off by Defendant  Carol who is the same person who terminated the Plaintiff. The short time period between the whistleblowing activity and termination demonstrates a clear causal nexus.

160. The lay-off/termination is an adverse action against them in violation of N.J.S.A. 34:19-8 (CEPA)

19

161. The conduct of Defendant Carrol a manager at TDB binds Defendant TDB based upon the legal theory of respondeat superior and vicarious liability.

162. Her manager knew that she complained because she told her about the illegal conduct.

163. As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries.  Furthermore, the Plaintiff has incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

## SECOND COUNT

## VIOLATIONS OF NEW JERSEY LAW AGAINST DISCRIMINATION

## N.J.S.A. 10:5-1 ET SEQ

## DISPARATE TREATMENT/ IMPACT/ RACE DISCRIMINATION

164. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

165. Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white employees at TDB by subjecting her to discriminatory harassment, hostile work environments, and other forms of discrimination in violation of NJLAD.

166. The Plaintiff is African American, which is a protected class.

167. Not one white employee in a similarly situated position as the Plaintiff was ever treated like the Plaintiff. She was set up to fail on numerous occasions during her 13-year tenure. Plaintiff was moved without her consent or even a discussion at times, denied and blocked from jobs she was interested in taking for progression, given projects she had no experience in, assigned the largest territory and numerous projects with no support, called upon to work out issues at the last minute, expected to do several jobs at once.  No white person in a similarly situated postion was moved like her in her department, no white employees in similarly situated situations were treated the same as this way as the Plaintiff.

168. Plaintiff was qualified for the jobs she was doing and those she sought to be moved or promoted to.

169. By reason of the continuous nature of Defendant discriminatory conduct against the Plaintiff, due to it being persistent throughout her employment at the "TDB" from 2006 until her termination in 2018. Defendant's consistent illegal actions constitute a pattern of

behavior under the law.

170. By reason of the continuous nature of Defendant discriminatory conduct against Plaintiff an African American that was humiliating and in violation of other laws as stated herein, Plaintiff is entitled to application of any continuing violation doctrine to all of the violations alleged herein.

171. Defendant's lay off was an adverse action.

172. There is a causal nexus between the Defendant's unlawful actions based on race and the adverse actions of failing to promote, transfer and laying off the Plaintiff.

173. Defendant TDB knew about the racial discrimination. Based on information and belief, the CEO Gregory B. Braca either stated that we have to treat our black people better or agreed this was true at an executive meeting off-site in January of 2020.

174. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, negligent and conducted in callous disregard of the rights of Plaintiff.

175. Defendant TDB policies, practices, and/or procedures have produced disparate treatment against plaintiff with respect to the terms and conditions of her employment.

176. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's racial discriminatory animus.

177. Defendant Carol indicated that Plaintiff was being laid off because they needed a senior project manager to handle projects of the residential lending department. Specifically, a project dealing with creating customer surveys. The Plaintiff learned on 10/30/19 that Project Managers would be centralized in the PMO (Project Management Office) and not in the business lines. This very fact made the rational for her layoff untrue.

178. Caucasian employees who failed to complete the technology project to create customer service surveys in July of 2018 assigned to Plaintiff were not laid off or terminated.

179. By reason of the discrimination suffered at "TDB", plaintiff is entitled to all legal and equitable remedies available under NJLAD.

180. As a direct and proximate result of the aforementioned conduct of Defendant, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries. Furthermore, Plaintiffs have incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

## THIRD COUNT

## VIOLATIONS OF THE NEW JERSEY LAW AGAINST

## DISCRIMINATION

## N.J.S.A 10:5-1 ET. SEQ.

## HOSTILE WORK ENVIRONMENT

181. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

182. All Defendants have created a hostile work environment for the Plaintiff by subjecting her to discriminatory conditions of employment, harassment, and other forms of discrimination in violation of NJLAD.

183. Plaintiff is an African American and part of a protected class.

184. Plaintiff is also being retaliated against in violation of CEPA stated within this complaint for complaining to Defendant Carrol about the illegality of the Defendant Linder's conduct.

185. Plaintiff was subjected to a recasting of her job so that she lost $7000 in pay. Plaintiff was blocked from advancing to positions, forced into positions without consent. Plaintiff was told to shut up when giving advice or disrespected or humiliated by her white supervisors and contemporaries.  Plaintiff was also constantly told that she was not a team player by her Caucasian managers. Plaintiff was also under the gun regarding her territories, work, projects and programs. She was under unfair and illegal scrutiny. This was all done to her because she was African American.

186. Plaintiff was set up to fail by Defendants due to her being African American.

187. Plaintiff incorporates all facts in the complaint stated above during her tenure.

188. The discrimination detrimentally affected the Plaintiff and the discrimination would have detrimentally affected a reasonable person in the same position since Plaintiff.

189. The discrimination was pervasive and regular and the frequency of the discriminatory conduct was severe. The discriminatory comments and conduct were humiliating and not a mere offensive utterance. The comments and conduct regarding race were continuous conduct for the majority of Plaintiff's 13-year tenure.

190. Defendant's conduct has been pervasive and regular, intentional, deliberate, willful,

malicious, reckless, negligent and conducted in callous disregard of the rights of plaintiff.

191.  Defendant's conduct unreasonably interferes with   the Plaintiff's work performance. Plaintiff would become sick; suffer severe emotional distress and mental anguish to a point where she had to leave work on many occasions.

192.  Plaintiff also started therapy due to her emotional distress and mental anguish caused by Defendant's racial harassment.

193.  The discrimination would have detrimentally affected on a reasonable person in the same position.

194.  There is existence of respondent superior liability.

195.  Defendant policies, practices, and/or procedures have produced a disparate impact against Plaintiff with respect to the terms and conditions of her employment and created a hostile work environment for the plaintiff.

196.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

197.  By reason of the continuous nature of Defendant discriminatory conduct against Plaintiff, persistent throughout her employment in the Defendant TDB from 2006 until her termination, she is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

198.  By reason of the discrimination and the creation of a hostile work environment suffered at Defendant TDB, Plaintiff is entitled to all legal and equitable remedies available under NJLAD.

199.  Plaintiff was forced to work in a hostile work environment that was created and fostered by Defendant, in violation of NJLAD, N.J.S.A. § 10:5-1 et seq.

200.  As a direct and proximate result of the aforementioned conduct of Defendant, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries.  Furthermore, the Plaintiff has incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

# FOURTH COUNT

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

201. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

202. Defendant's conduct has caused the Plaintiff to have suffered severe emotional distress through the loss of her employment for which they caused pain and suffering.

203. Plaintiff was subjected racial harassment and discrimination.  Plaintiff was embarrassed and belittled by comments from white staff about not being a team player, African Americans not being a good market for mortgages, as well as not her supporting a program that the TDB and the KKK support, and other humiliating and degrading conduct and comments including taking an unwarranted pay cut, being blamed for white counterparts work errors, failing to be promoted, throughout 13 years of employment which is outrageous conduct.  She has been diagnosed with high blood pressure and severe emotional stress due to the outrageous and extreme conduct of the people at Defendant TDB.

204. Defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

205. Defendant's acts toward Plaintiff were intentional and intended to cause Plaintiff to suffer emotional distress.

206. Defendant's actions were the proximate cause of her emotional distress.

207. The emotional distress Plaintiff endured was so severe that no reasonable person could be expected to endure it.

208. As a direct and proximate result of Defendant's offensive conduct, plaintiff was injured, suffered severe anxiety, fear, depression, emotional distress, mental anguish, weight and hair lost, embarrassment, humiliation, and other intangible injuries.

209. As a direct and proximate result of the aforementioned offensive conduct of Defendants, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries. Furthermore, Plaintiffs have incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

24

## FIFTH COUNT

## VIOLATIONS OF THE NEW JERSEY LAW AGAINST

## DISCRIMINATION 10:5-1 ET. SEQ. AGE DISCRIMINATION

## DISPARATE TREATMENT

Plaintiff re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

210. Defendant's has discriminated against Plaintiff by treating her differently due to her age, being over 40 years old, from younger employees in the Defendant TDB by subjecting her to conditions of employment, harassment, hostile work environments, and other forms of discrimination in violation of NJLAD.

211. Plaintiff is 45 years old. She is part of a protected class.

212. Defendants did not terminate younger workers from the Plaintiff's work group. Plaintiff was just as qualified for her position or other positions in TDB if not more qualified than the younger workers that were not terminated.

213. Age cannot be a determining factor in this case as it is illegal and not a bona fide criterion under the law to do this job.

214. Plaintiff's lay-off/termination is an adverse action.

215. There is a causal nexus between the adverse action lay off and the unlawful activity of age discrimination. The younger employees were not terminated.

216. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, negligent and conducted in callous disregard of the rights of Plaintiff.

217. Defendant TDB policies, practices, and/or procedures have produced a disparate impact against Plaintiff with respect to the terms and conditions of her employment. Plaintiff was terminated from her employment and a younger person was placed in her position.

218. The stated reasons for the Defendant's conduct were not the true reasons, but    instead were pretext to hide the Defendant's discriminatory animus.

219. By reason of the continuous nature of Defendant discriminatory conduct against Plaintiff, persistent throughout her employment in the "TDB" from 2006 until her termination, plaintiff is entitled to application of the continuing violation doctrine to all of the violations alleged herein.

25

220. By reason of the discrimination suffered at the "TDB", plaintiff is entitled to all legal and equitable remedies available under NJLAD.

221. As a direct and proximate result of the aforementioned conduct of Defendant, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries.  Furthermore, the Plaintiff has incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

## SIXTH COUNT

## NEW JERSEY LAW AGAINST DISCRIMINATION N.J.S.A. 10:5-1 ET. SEQ.

## AIDING AND ABETTING

222. Plaintiff repeats and re-alleges each statement made in the preceding paragraphs as if same were set forth at length herein.

223. Individual Defendants Amber Carol, Scott Lindner, Rick Bectel, are the employers of Plaintiff.

224. Defendant's Amber Carol, Scott Lindner, Rick Bectel operated the Defendant TDBs and supervised the Plaintiff when she worked for the Defendant TDB.  They controlled the Plaintiff's workplace.

225. Defendant Amber Carol terminated Plaintiff form her employment in October of 2019.

226. Based on information and belief, Defendant's Scott Lindner and Rick Bectel were also involved in the termination of the Plaintiff.

227. The acts of the individual Defendants Amber Carol, Scott Lindner and Rick Bectel as described herein were committed within the scope of employment.

228. Defendants Amber Carol, Scott Lindner and Rick Bectel racially harassed, discriminated against the Plaintiff based on race, created a hostile work environment and retaliated against the Plaintiff as described within this complaint.

229. Defendant Defendants Amber Carol, Scott Lindner and Rick Bectel knew about the unlawful behavior and failed to remediate the issue.

230. By engaging in this course of unlawful conduct, Defendants Amber Carol, Scott Lindner and Rick Bectel, knowingly gave substantial assistance and/or encouragement to

26

Defendant TDB in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-5.1 et. seq.

231. By engaging in this course of unlawful conduct, Defendants Amber Carol, Scott Lindner, and Rick Bectel, knowingly gave substantial assistance and/or encouragement to the other Defendant's, each other in violation of the New Jersey Law Against Discrimination N.J.S.A 10:5-5.1 et. seq.

232. By virtue of the acts set forth in this complaint, individual Defendants Amber Carol, Scott Lindner and Rick Bectel aided and abetted and/or attempted to aid and abet unlawful discrimination in violation of Plaintiff's rights secured under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et. seq.

233. As a direct and proximate result of the aforementioned conduct of Defendants, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries.  Furthermore, the Plaintiff has incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

## SEVENTH COUNT

## N.J.S.A. VIOLATIONS OF NEW JERSEY LAW AGAISNT

## DISCRIMINATION N.J.S.A. 10:5-1 ET SEQ

## FAILURE TO PROMOTE DISPARTE TREATMENT/ IMPACT/ RACE

## DISCRIMINATION

234. Plaintiff re-alleges and incorporates by reference each and every allegation contained in each and every aforementioned paragraph as though fully set forth herein.

235. Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white employees at "TDB" by subjecting her to discriminatory harassment, hostile work environments, and other forms of discrimination in violation of NJLAD.

236. The Plaintiff is African American, which is a protected class.

237. Not one white employee in a similarly situated position as the Plaintiff was ever treated like the Plaintiff. She was set up to fail during her 13-year tenure. Plaintiff was moved without her consent or even a discussion at times, denied and blocked from jobs she was

27

interested in taking for progression, given projects she had no experience in, assigned the largest territory and numerous projects with no support, called upon to work out issues at the last minute, expected to do several jobs at once. No white person was moved like her in her department, no white employees in similarly situated situations were treated the same as this way as the Plaintiff.

238. Defendants failed to promote the Plaintiff on several occasions.

239. Plaintiff was qualified for the jobs she was doing and those she sought to be moved or promoted to.

240. By reason of the continuous nature of Defendant discriminatory conduct against plaintiff, which was persistent throughout her employment in the "TDB" from 2006 until her termination. Defendant's consistent illegal actions constitute a pattern of behavior under the law.

241. By reason of the continuous nature of Defendant discriminatory conduct against Plaintiff an African American that was humiliating and in violation of other laws as stated herein, Plaintiff is entitled to application of any continuing violation doctrine to all of the violations alleged herein.

242. By reason of the race discrimination suffered at TDB, Plaintiff is entitled to all legal and equitable remedies available under NJLAD.

243. Defendant's failure to promote and transfer are adverse actions.

244. There is a causal nexus between the Defendant's unlawful actions based on race and the adverse actions of failing to promote, transfer and laying off the Plaintiff.

245. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, negligent and conducted in callous disregard of the rights of Plaintiff.

246. Defendant "TDB" policies, practices, and/or procedures have produced disparate treatment against plaintiff with respect to the terms and conditions of her employment.

247. The stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's racial discriminatory animus.

248. By reason of the discrimination suffered at Defendant "TDB", plaintiff is entitled to all legal and equitable remedies available under NJLAD.

249. As a direct and proximate result of the aforementioned conduct of Defendant, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries. Furthermore, Plaintiffs have incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

28

# EIGHTH COUNT

# WRONGFUL TERMINATION

250. Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if the same were set forth at length herein.

251. Defendant wrongfully terminated Plaintiff by terminating her without cause.

252. Defendant Carol indicated that Plaintiff was being laid off because they needed a senior project manager to handle projects of the residential lending department. Specifically, a project dealing with creating customer surveys.

253. The Plaintiff learned on 10/30/19 that Project Managers would be centralized in the PMO (Project Management Office) and not in the business lines. This very fact made the rational for her layoff untrue.

254. Prior to the layoff, Plaintiff was assigned a technology project to create customer service surveys in July of 2018.

255. The person who was already on the project was Alexander Shreeve, left Defendant TDB in September 2018.

256. Plaintiff told Defendant Carroll, her manager that she did not have experience in technology and needed training to complete the project.

257. Defendant Carroll   indicated that it was an easy project and it would not be a problem for the Plaintiff to complete.  They indicated everything was done and she just needed to get them over the finish line.

258. This was not true.  Four people who handled this project prior to the Plaintiff could not complete it.

259. Plaintiff was able to make significant progress on the project by completing all steps in the new Vendor Management process which included corporate risk, compliance, privacy reviews, Technology review and approvals.  It also included Cloud Governance review and approval.

260. Due to the vendor's inability to provide a secure process ensuring Defendant TDB's customer personal private date would be protected the project recommendation was not to proceed with the initiative. Defendant Becktel introduced the relationship to Defendant TDB and was happy with the final recommendation.

29

261. No one was able to complete the project due to the difficultly of creating the surveys, legal, technology, customer information being secured and other issues that required several levels of review and approval.

262. Plaintiff was in charge of regulatory governance and controls in the department. Her duties were to ensure regulatory and legal compliance of a business that was heavily regulated, not technology or creation of surveys

263. This project was not part of the Plaintiff's job responsibilities.

264. Plaintiff was not trained to complete the type of technology work this project required.

265. Within two weeks of reporting Defendant Linder's illegal activing in October of 2019 Plaintiff was laid off due to her not being able to complete this project regarding creating customer survey's and technology as a senior project manager.

266. Plaintiff asked multiple times for scoping resources or a Technology Project Lead or assistance from the PMO office and was refused on each occasion by either Defendant Lindner or Defendant. Carroll.

267. Based on information and belief the four other employees who were in charge of this project prior to Plaintiff being assigned to the project were not laid off or fired based on them not completing this project.

268. Plaintiff had worked on this project since July of 2018 and made some head way on the project, however she was terminated due to the project in October of 2019.

269. Based on information and belief that the first rounds of layoffs were completed in the spring.

270. One set was in the spring of 2019 and the other was due to happen in the spring of 2020, not the fall when Plaintiff was laid off.

271. Plaintiff was set up to fail with this particular project from the beginning. This project was not within the Plaintiff's experience and Defendant TDB provided no training to Plaintiff to complete it. Nevertheless, they terminated her due to her not being able to complete it.

272. Defendant's reason for terminating the Plaintiff was incorrect and not warranted because she was not experienced in the substance of the project and it never should have been assigned to her because it was not within her duties to complete.

273. Defendant's termination for this reason is not warranted, illegal and not for cause.

274. Plaintiff was wrongfully terminated.

30

275. Defendants humiliated, harassed, tortured and demeaned Plaintiff throughout her tenure with the Defendant TDB.

276. Due to all of the continuous actions the Defendant have taken toward Plaintiff as delineated within this complaint by Defendant including all causes of action in this complaint in violation of the NJLAD and other laws as alleged within this complaint, entitles Plaintiff to an application of any continuing violation doctrine to all of the violations alleged herein.

277. As a direct and proximate result of the aforementioned conduct of Defendant, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries.  Furthermore, the Plaintiff has incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

# NINTH COUNT

# FICTITIOUS PARTIES

278. Plaintiff repeats and re-alleges each of the statements set forth in the preceding paragraphs as if the same were set forth at length herein.

279. Defendants John Does 1-10 are to date unknown and/or undiscovered individuals yet to be discerned who were employed by Defendants, or its related entities, and who actively by Defendant, or its related entities, and who actively participated in and/or aided and abetted in the unlawful conduct directed towards the Plaintiff.

280. Defendants ABC Corporations 1-10 are to date unknown and/or undiscovered entities including both private organizations and any public or quasi-public bodies and-or organizations yet to be discerned who were employed by the Defendant who actively participated in and/or aided and abetted in the unlawful conduct directed towards the Plaintiff.

281. As a direct and proximate result of the aforementioned conduct of Defendant, Plaintiff has suffered and will continue to suffer economic damages and losses, severe emotional distress, severe anxiety, fear, physical and emotional pain and suffering, mental anguish, depression, embarrassment, humiliation, and other intangible injuries.  Furthermore, the Plaintiff has incurred additional costs and expenses which would not have been incurred but for Defendants unlawful conduct.

31

**PRAYER FOR RELIEF**

Wherefore Plaintiff demands Judgment against all Defendants, and each of them, for the following:

A.  Compensatory damages;
C.  Incidental damages;
D.  Consequential damages;
E.  Punitive and/or treble damages;
F.  Costs of Suit;
G.  Attorneys' fees;
H.  Pre & Post and other Interest;
I.  Pain & Suffering and
I.  Such other and further relief as the Court deems just and equitable.


Desha Jackson Law Group, LLC.
Attorney for Plaintiff, Melissa Blount

By: /s/Desha Jackson
     DESHA JACKSON, ESQ.

Dated: 12/9/2020

**JURY DEMAND**

Plaintiff demands trial by jury as to all matters herein.


**DEMAND FOR INSURANCE INFORMATION**

Pursuant to R. 4:10(b), demand is hereby made that Defendants disclose to Plaintiff's attorney whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment and provide Plaintiff's attorney with true copies of such insurance agreements or policies including, but not limited to, any and all declaration sheets.  This demand shall be deemed to include and cover not only primary coverage but also any and all excess, catastrophe and umbrella policies.


**DESIGNATION OF TRIAL COUNSEL**

Desha Jackson, Esq., has been designated as trial counsel on behalf of the Plaintiff(s) in the above-captioned matter pursuant to R. 4:25-4.

32

Desha Jackson Law Group, LLC.
Attorney for Plaintiff, Melissa Blount

By: /s/ Desha Jackson
      DESHA JACKSON, ESQ.

Dated: 12/9/2020

## DEMAND TO PRESERVE EVIDENCE

1.  All defendants are hereby directed and demanded to preserve all physical and electronic information pertaining in any way to plaintiff's employment, to plaintiff cause of action and/or prayers for relief , to any defenses to same, and pertaining to any party, including, but not limited to, electric data storage, closed circuit TV footages, digital images, computer images, cache memory, searchable data, emails, spread sheets, employment files, memos, text messages and any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, Twitter, MySpace, etc.) and any other information and/or documents which may be relevant to any claim or defense in this litigation.

2.  Failure to do so will result in separate claims for spoliation of evidence and/or for appropriate adverse inferences.

Desha Jackson Law Group, LLC.
Attorney for Plaintiff, Melissa Blount

By: /s/ Desha Jackson
      DESHA JACKSON, ESQ.

Dated: 12/9/2020

## CERTIFICATIONS

The undersigned hereby certifies pursuant to R. 4:5-1 that the matter in controversy is not the subject of any other action pending in any other Court and is likewise not the subject of any pending arbitration proceeding. The undersigned further certifies that she has no knowledge of any action or arbitration proceeding which is contemplated regarding the subject matter of this action and that she is not aware of any other parties who should be joined in this action.

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

I hereby certify that the complaint and all documents annexed hereto comport with the requirements of R. 1-4.8(a).

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


/s/ Desha Jackson

_____
Desha L. Jackson, Esq.

Date: 12/9/2020

34

# Civil Case Information Statement

## Case Details: CAMDEN | Civil Part Docket# L-004038-20

**Case Caption:** BLOUNT MELISSA  VS TD BANK NA

**Case Initiation Date:** 12/09/2020

**Attorney Name:** DESHA LANG JACKSON

**Firm Name:** DESHA JACKSON LAW GROUP LLC

**Address:** 200 DANIELS WAY STE 200

FREEHOLD NJ 07728

**Phone:** 7324146663

**Name of Party:** PLAINTIFF : Blount, Melissa

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** LAW AGAINST DISCRIMINATION (LAD) CASES

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** YES

**Are sexual abuse claims alleged by: Melissa Blount?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
#### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

    **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

12/09/2020

Dated

/s/ DESHA LANG JACKSON

Signed