**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MELISSA BLOUNT,

              Plaintiff,

     v.

TD BANK, N.A., et al,

             Defendants.

No. 1:20-cv-18805-NLH-MJS

**OPINION**

<u>**APPEARANCES**</u>:

DESHA JACKSON
DESHA JACKSON LAW GROUP, LLC
4400 ROUTE 9 SOUTH
SUITE 1000
FREEHOLD, N.J. 07728

    *On behalf of Plaintiff Melissa Blount*

A. KLAIR FITZPATRICK
MORGAN LEWIS & BOCKIUS
1701 MARKET STREET
PHILADELPHIA, PA. 19103

RUDOLPH J. BURSHNIC
MORGAN, LEWIS & BOCKIUS LLP
502 CARNEGIE CENTER
PRINCETON, N.J. 08540

    *On behalf of Defendants TD Bank, N.A., Amber Carroll, and*
    *Scott Lindner*

ERIN KATHLEEN CLARKE
MONTGOMERY MCCRACKEN WALKER & RHOADS LLP
457 HADDONFIELD ROAD
SUITE 600
CHERRY HILL, N.J. 08002

```
RENEE NUNLEY SMITH
MONTGOMERY MCCRACKEN WALKER & RHOADS
1735 MARKET STREET
21ST FLOOR
PHILADELPHIA, PA. 19103

WILLIAM K. KENNEDY, II
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
MAIN STREET
PLAZA 1000-SUITE 500
VORHEES, N.J. 08043
```

*On behalf of Defendant Rick Bechtel*

**HILLMAN**, **District Judge**

Pending before the Court are the motions to dismiss Plaintiff Melissa Blount's ("Plaintiff") third amended complaint ("TAC") of Defendant Rick Bechtel, (ECF 56), and Defendants TD Bank, N.A. ("TD"), Amber Carroll, and Scott Lindner, (ECF 57). For the reasons expressed below, both motions will be granted in part and denied in part.

## I.   **Background**

Plaintiff is a resident (and apparent domiciliary) of Charlotte, North Carolina who worked for TD in various positions over the course of thirteen years in offices in Mahwah, Cherry Hill, and Mount Laurel, New Jersey.  (ECF 53 at ¶¶ 1-2, 10-11). Relevant to some of her claims, Plaintiff is African American and over the age of forty-five.  (Id. at ¶¶ 1, 10).  TD is a national bank association which Plaintiff describes as being "headquarter[ed]" in Cherry Hill, New Jersey and Portland,

2

Maine.  (Id. at ¶ 3).[1]  Bechtel, Carroll, and Lindner were
managers and supervisors at TD offices in Mount Laurel and were
Plaintiff's superiors.  (ECF 53 at ¶¶ 6-9).

In June 2019, Plaintiff was assigned a technology project
to get "across the finish line" and for which Carroll informed
her significant work had already been completed.  (Id. at ¶
151).  Plaintiff had no experience leading such projects and
soon learned that the project was more complex than she had been
told.  (Id. at ¶¶ 151-52).  Nonetheless she drafted an executive
summary for Bechtel and Carroll on October 19, 2019 outlining
risks associated with the project and was asked to proceed.
(Id. at ¶ 153).  Plaintiff was denied assistance and despite
Plaintiff making significant progress as the fifth employee to
work on the project, the ultimate recommendation was to not
proceed with the project due to a vendor's inability to secure
customer data, which upset Bechtel.  (Id. at ¶¶ 154-55).

At about this same time, Plaintiff alleges that she
expressed concerns to Carroll regarding Lindner allegedly
providing early product access to mortgage loan officers, which
she believed violated Regulation Z of the Truth in Lending Act
and resulted in origination approval of two loans outside the

---

[1] As explained more fully below, the test for determining the
domicile of TD for purposes of diversity jurisdiction is its
"main office" which may or may not be synonymous with
"headquarters."  Defendants' notice of removal states that TD's
main office is in Wilmington, Delaware.  (ECF 1 at ¶ 1(b)).

scope of the 2019 compensation plan and, further, the relevant loan officer working without hope of compensation. (Id. at ¶ 14).  Plaintiff's understanding was confirmed by Human Resources on October 17, 2019.  (Id. at ¶ 15).

After she returned from vacation on October 24, 2019, Plaintiff received a call from Lindner regarding two projects that she was assigned and Lindner stated "very firmly in a yelling voice" that loan officers would be paid on loans.  (Id. at ¶ 16).  Plaintiff messaged Human Resources after the conversation but did not receive a reply and her one-on-one meeting with Carroll was postponed from October 25 to October 30.  (Id. at ¶¶ 16-17).  Plaintiff's employment was terminated on October 30, 2019 – purportedly due to the need to hire a senior project manager – and her last day of work was scheduled for January 3, 2020.  (Id. at ¶¶ 17-20).  Plaintiff was the only member of the Mortgage Department terminated and her termination was "off-cycle," as other notices had gone out in May and June. (Id. at ¶ 155).

Lindner allegedly repeatedly called Plaintiff on her cell phone for two days during the first week of November 2019, the first of which she answered while responding to the remainder via email.  (Id. at ¶ 21).  Lindner questioned actions taken by Plaintiff at his direction, which she interpreted as her being blamed for perceived shortcomings following her termination.

(Id. at ¶¶ 22-24).

Plaintiff's termination was preceded by alleged discriminating or harassing behavior dating back to the beginning of her tenure at TD in 2006.  The Court will refer to these allegations throughout this opinion but summarizes them as follows.  Plaintiff alleges that in March 2006 she was offered a community development manager position at TD, declined it due to salary, was informed that TD would not negotiate, and was later offered an acceptable sum.  (Id. at ¶¶ 39-40).  Later, during an annual review, Plaintiff was allegedly informed in a "harsh" email that she would receive a one-time raise but would not receive another due to her salary already being out of range. (Id. at ¶ 40).

Plaintiff alleges that no Caucasian peer received such messages and that she was generally referred to as aggressive or not a team player when she spoke up for herself – an allegation that is repeated throughout the TAC.  (Id. at ¶¶ 40-41, 44, 49, 54, 61, 76, 81, 101-02, 105, 157, 167-68, 173).  Plaintiff asserts that labels such as "aggressive" are commonly directed toward African American women who perform their work with passion or zeal to demean or humiliate them and Plaintiff's Caucasian colleagues were not treated in such a way.  (Id. at ¶¶ 76-79).

Plaintiff was asked during an October 2006 meeting to

5

support Deerfield Township's annual fair, which she declined
after allegedly discovering via a Google search that the event
was sponsored by the Ku Klux Klan.  (Id. at ¶¶ 34-37).  TD's
alleged support of the Ku Klux Klan through its sponsorship of
the fair constitutes "possible evidence of a discriminatory
motive," according to Plaintiff.  (Id. at ¶ 38).

In or around March 2007, Plaintiff was called to the office
of Mid-Atlantic Regional President Wendy Suehrstedt, who
instructed that Plaintiff would be asked to perform both
community-development and community-relations duties without
additional compensation.  (Id. at ¶¶ 50-52).  However,
Plaintiff's manager, Mr. Lagueux, eventually stepped in to avoid
this arrangement.  (Id. at ¶ 53).  Plaintiff also alleges that
division head Beth Warn often referred to Plaintiff as
aggressive and not a team player and humiliated Plaintiff by
instructing her on how to address African American individuals
prior to a meeting in New York City, which Plaintiff alleges
represented racial stereotyping.  (Id. at ¶¶ 54-55).

At some point in 2008, Plaintiff was allegedly excluded
from meetings and not provided necessary materials in advance of
a meeting with representatives of the City of Philadelphia as a
means of humiliating her due to her race.  (Id. at ¶¶ 64-66,
73).  When Plaintiff rescued the bank's relationship with the
city with her superior knowledge, she was offered office space

6

in company headquarters in Cherry Hill but not a promotion.
(Id. at ¶¶ 67-72, 74).

Following TD's merger with Commerce Bank in May 2008,
Plaintiff helped train new community relations managers – all
Caucasian women – and was informed that office space was
available to her in the Community Relations office while she
held her existing office in Cherry Hill.  (Id. at ¶¶ 57-58).
Plaintiff was ultimately informed that she would have office
space in Cherry Hill for as long as she wanted, but she worked
at Community Relations for two days while her manager was on
vacation and asserts that she was asked not to utilize office
space she was entitled to due to her race.  (Id. at ¶¶ 59-61).

Plaintiff applied for a new position at the suggestion of
Vice President Jeffrey Burnham in October 2009 and after her
second interview she informed her manager, Lagueux, who in turn
instructed her to inform Warn of her interest.  (Id. at ¶ 80).
Because Warn had allegedly been unsupportive of Plaintiff in the
past, Plaintiff felt discouraged in pursuing the new position
out of fear that Warn would describe her with labels such as
"aggressive" while speaking with other business partners and
resolved to withdraw from consideration.  (Id. at ¶¶ 81-83).
Plaintiff was congratulated for receiving the position by a
community relations manager in December 2009, which made
Plaintiff believe that she was being pushed out of her role as

7

she had not yet been offered the job and was unsure about accepting it. (Id. at ¶ 84). The job was offered to Plaintiff in January 2010, but it was a lower-graded position – meaning losses of title and salary – leading Plaintiff to need to fight for her desired salary, which she was ultimately offered. (Id. at ¶¶ 85-88).

Malcolm Hollensteiner joined TD in June 2011 as Director of Retail Lending Sales with Plaintiff reporting directly to him and expected to maintain expertise in forty projects, additional work that was unique to her as the only African American manager. (Id. at ¶¶ 90-91). Plaintiff claims that TD is known for insufficiently lending to low- and moderate-income individuals as required by the Community Reinvestment Act, which evidences discriminatory animus on the part of TD as such loans largely benefit African American and Latinx households. (Id. at ¶¶ 93-95). Plaintiff would share reasons for offering discounted products in furtherance of the Community Reinvestment Act, but after months of her input not being followed, Plaintiff suggested that she transition to a project-manager position. (Id. at ¶¶ 96-97).

A "Lift and Shift" took place where the Mortgage Department was separated into operations and sales shortly after Plaintiff was moved to project manager in April 2014, leading Plaintiff to becoming a department of one tasked with ensuring compliance

8

with federal, state, and local mortgage laws.  (Id. at ¶ 98).
Plaintiff would sometimes be busy and not answer calls or
messages right away, leading to comments concerning her supposed
inability to be found that were not directed toward Caucasian
managers.  (Id. ¶¶ at 103-04).

Plaintiff applied for a risk-manager position at some time
in 2015 and was initially given the job before being informed
several weeks later that she could not leave her position as the
loss of her institutional knowledge would be harmful to
business.  (Id. at ¶¶ 110-11).  Her current position was then
reclassified within the Mortgage Department at a lower level,
resulting in a $7,000 salary reduction and impacting her ability
to earn raises, reach bonuses, and be eligible for stock
options.  (Id. at ¶¶ 112-13).  Plaintiff did not work for two
weeks during September 2015 due to stress and frustration
leading to depression and anxiety.  (Id. at ¶ 114).

Warn and Carroll, both Caucasian supervisors, consistently
undermined, belittled, harassed, and humiliated Plaintiff no
matter her effectiveness and superiors' "deliberate confusion"
represented racial discrimination, according to Plaintiff.  (Id.
at ¶¶ 119-121).  Plaintiff was asked by co-worker Michelle
LarMoore in October 2017 why Plaintiff was permitted to work in
Charlotte and sales support specialist Erica Gauge was permitted
to work from home because LarMoore had been asked by Carroll.

(Id. at ¶¶ 132-33).  Working from home was common and Carroll allegedly did not ask about any employees other than Plaintiff, LarMoore, and Gauge – the only African American women on Carroll's team.  (Id. at ¶¶ 133-35).[2]  Plaintiff also sought to take various courses and trainings but learned that such opportunities were only available to Canadian employees and alleges that she did not have internal opportunities to improve herself while Caucasian co-workers were permitted to attend conferences.  (Id. ¶¶ at 139-40).

In January 2018, Plaintiff was removed from managing a training bootcamp and later replaced by Matt Buganza, a less-qualified Caucasian male.  (Id. at ¶ 141).  Also in January 2018, Plaintiff was brought back into a compliance role but not included in meetings or committees and was not granted access to various reports and systems or alerted of operations issues as requested.  (Id. at ¶¶ 138, 142).

Plaintiff participated in her first performance review with Carroll in November 2018 and Carroll raised several issues including her belief that Plaintiff did not belong on her team and – without providing specifics – that comments had been made that Plaintiff sometimes could not be found, resulting in

_____

[2] The TAC makes brief reference to both Erica Gauge and a "Ms. Gamble."  (ECF 53 at ¶¶ 132-33).  The Court believes based on its reading of the TAC that Gauge and Gamble are the same individual.

Carroll requesting that Plaintiff be the only member of her department to place hours of availability in her email signature.  (Id. at ¶¶ 147-48).  Later, during a February 2019 sales conference in Atlantic City, Bechtel summoned Plaintiff to explain to a vendor why a project had not yet been completed, embarrassing her.  (Id. at ¶ 149).  Plaintiff's office was allegedly moved to the break/lunchroom in May 2019, away from her colleagues.  (Id. at ¶ 150).

The TAC then goes on to Plaintiff's work on the technology project preceding her termination.  (Id. at ¶¶ 151-55). Plaintiff alleges generally that she was often asked to perform additional work without recognition or compensation; lost pay, benefits, and promotional opportunities; and was belittled and questioned in ways Caucasian colleagues were not.  (Id. at ¶¶ 156-61).  She asserts that a culture of racial animus exists at TD; African American employees were discriminated against; and it was generally known that African American employees were not promoted into high-level positions and those who were promoted were ridiculed, not supported, and set up to fail.  (Id. at ¶¶ 174-77).  Any neutral reason for her termination is pretextual, according to Plaintiff, and she could have been placed in a different position after thirteen years of service.  (Id. at ¶ 181).  Plaintiff claims that she was clearly unprotected following her whistleblowing of Lindner's alleged actions as

evidenced by him calling her following her return from vacation
and that Lindner, Carroll, and Bechtel decided to terminate her
due to her race.  (Id. at ¶ 182).

Plaintiff filed suit in New Jersey Superior Court Law
Division – Camden County on December 9, 2020, (ECF 1-1), and
Defendants removed the action to this District, (ECF 1).
Plaintiff moved to remand on January 8, 2021, (ECF 9), which
this Court denied, (ECF 22; ECF 23).  Defendants later moved to
strike and dismiss Plaintiff's second amended complaint ("SAC").
(ECF 25; ECF 40).

In a September 19, 2022 opinion and order, the Court
dismissed the SAC for failure to comport with Federal Rule of
Civil Procedure 8 and provided Plaintiff twenty days to amend.
(ECF 49; ECF 50).  The Court provided specific guidance to
Plaintiff for amendment, including refraining from repeated
allegations unless necessary, identifying the specific
allegations and counts applicable to each Defendant, and
organizing allegations in chronological order to the extent
possible.  (ECF 49 at 11).  The Court further cautioned
Plaintiff to be "judicious in the repleading of a third amended
complaint," that a wrongful-termination claim sharing a factual
predicate with a New Jersey Law Against Discrimination ("NJLAD")
claim would be preempted, and – in response to Defendants'
argument to strike untimely allegations – that "if Plaintiff

12

does not connect events prior to the limitations period and in connection with other employees to her specific case in an amended complaint, the Court will not hesitate to dismiss that complaint with prejudice." (Id. at 9 n.2, 11 n.3).

Plaintiff filed the TAC on October 28, 2022 after the Court granted her request for an extension.  (ECF 52; ECF 53).  The TAC asserts eight substantive counts:[3] violations of the Conscientious Employee Protection Act, ("CEPA"), as to all Defendants (Count 1); disparate treatment, race discrimination, and hostile work environment in violation of the NJLAD as to all Defendants (Counts 2 and 3); age discrimination and disparate treatment in violation of the NJLAD as to TD and Carroll (Count 5); aiding and abetting in violation of the NJLAD as to Carroll, Lindner, and Bechtel (Count 6); failure to promote, disparate treatment, disparate impact, and race discrimination in violation of the NJLAD as to TD (Count 7); intentional infliction of emotional distress ("IIED") as to all Defendants (Count 4); and common-law wrongful termination as to all

---

[3] Count 9 of the TAC does not assert any additional allegations, but rather refers to unknown and undiscovered parties.  (ECF 53 at C.9 ¶ 281-84).  The Court further notes, as recognized in Defendants' supporting briefs, (ECF 56 at 5 n.2; ECF 57-1 at 5-6), that paragraphs within the TAC are consistently and confusingly misnumbered – with the Parties and Statement of Facts section spanning from Paragraphs 1 to 185, Count 1 beginning at Paragraph 154, and the paragraph numbers of the final few paragraphs of each count repeated to begin the next Count, (ECF 53).

Defendants (Count 8).

Defendants thereafter moved to dismiss the TAC, (ECF 56;
ECF 57), to which Plaintiff filed oppositions, (ECF 66; ECF 67),
and Defendants replied, (ECF 68; ECF 69).

## II. Discussion

### A. Jurisdiction

The Court exercises original jurisdiction over this action
as the matter in controversy exceeds $75,000 exclusive of
interest and the parties are diverse in citizenship.  See 28
U.S.C. § 1332(a).[4]

---

[4] The citizenship of individuals for the purpose of diversity
jurisdiction "is synonymous with domicile, and 'the domicile of
an individual is his true, fixed and permanent home and place of
habitation.  It is the place to which, whenever he is absent, he
has the intention of returning.'"  See Park v. Tsiavos, 165 F.
Supp. 3d 191, 198 (D.N.J. Feb. 29, 2016) (quoting Vlandis v.
Kline, 412 U.S. 441, 454 (1973)).  A "national bank is a citizen
of the state in which its main office, as set forth in its
articles of association, is located."  Zarour v. JPMorgan Chase
Bank, N.A., No. 14-cv-06261, 2017 WL 684463, at *3 (D.N.J. Feb.
21, 2017) (citing Wachovia Bank v. Schmidt, 546 U.S. 303, 307
(2006)); see also Spano v. JP Morgan Chase Bank, NA, 521 F.
App'x 66, 69 n.2 (3d Cir. 2013) (same).  The TAC asserts that
Plaintiff is a "resident of the State of North Carolina" and
that TD is "headquarter[ed]" in both Cherry Hill, New Jersey and
Portland, Maine.  (ECF 53 at ¶¶ 1, 3).  Curiously, the TAC
repeats the SAC's allegation of TD's dual headquarters in New
Jersey and Maine, presumably for the purpose of stating
citizenship for diversity purposes, despite "headquarters" not
being the proper term and despite Defendants' notice of removal
– filed nearly two years prior to the TAC – clearly asserting
that TD's "main offices" are in Wilmington, Delaware.  (ECF 1 at
¶ 1(b)).  The TAC also does not provide any domicile information
for Carroll, Lindner, or Bechtel, though the notice of removal
states that they reside in New Jersey, New Jersey, and Illinois,
respectively, (id. at ¶¶ 1(c)-(e)), or, for that matter,

**B. Motions to Dismiss**

In advance or in lieu of an answer to a complaint, a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  To survive dismissal under Rule 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief,'" Doe v. Princeton Univ., 30 F.4th 335, 341 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)), and – accepting the plaintiff's factual assertions, but not legal conclusions, as true – "'plausibly suggest[]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged,'" id. at 342 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) and Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Courts further evaluate the sufficiency of a complaint by

---

Plaintiff, alleging only that she resides in North Carolina, (ECF 53 at ¶ 1).  The parties' briefs do not dispute diversity of citizenship and the Court has no reason to question the citizenship of the parties as stated in the notice of removal. See Malanga v. State Farm Ins. Co., No. 13-7712, 2014 WL 4244234, at *1 (D.N.J. Aug. 26, 2014) ("In most cases where federal jurisdiction is predicated on diversity of citizenship, the removing defendant must demonstrate that the action satisfies the amount in controversy threshold and that complete diversity exists between the parties." (citing In re Briscoe, 448 F.3d 201, 215 (3d Cir. 2006))).  However, as the Federal Rules of Civil Procedure now clearly provide by amendment effective December 2022, and to settle this ambiguity, Plaintiff as well as all Defendants, will be directed to file a Disclosure Statement as to their citizenship – i.e. their domicile not residency – no later than fourteen days after the issuance of this Opinion.  Fed. R. Civ. P. 7.1(a)(2).

"(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

For the purpose of orienting its analyses, the Court will discuss the elements necessary to state prima facie claims for each count asserted by Plaintiff. In so doing, the Court remains cognizant that "[f]or employment discrimination claims, 'a complaint need not establish a prima facie case in order to survive a motion to dismiss'" because "[a] prima facie case is 'an evidentiary standard, not a pleading requirement.'" Mutazz v. Amazon.com Servs. LLC, No. 21-19987, 2022 WL 2713974, at *4 (D.N.J. July 13, 2022) (quoting Connelly v. Lane Constr. Corp., 809 F.3d 780, 789 (3d Cir. 2016) and then Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002)). Nonetheless, the Court will seek "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]" of each cause of action asserted by Plaintiff. Id. (alteration in original) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)); see also Cotto v. Ardagh Glass Packing, Inc., No. 18-1037, 2018 WL 3814278, at *3-4 (D.N.J. Aug. 10, 2018) (same).

## III. Analysis

### A. Rules 8 and 12(f)

Before moving to the substance of the TAC, the Court will consider Defendants' arguments relating to its general sufficiency.  Defendants urge the Court to strike and dismiss the TAC for failure to present concise and direct allegations as required by Rule 8 of the Federal Rules of Civil Procedure or follow the guidance provided in the Court's September 19, 2022 opinion.  (ECF 56 at 4-6; ECF 57-1 at 4-9).  Defendants review in detail the perceived ongoing deficiencies present in the TAC, including its increased length, repetition of allegations, failure to present facts in chronological order, references to individuals and events not clearly related to Plaintiff's causes of action, and failure to tie otherwise untimely actions to those within the statutory period.  (ECF 57-1 at 5-7).  Defendants also represent that the document accompanying the TAC, "Amended Complaint Changes Shown in Bold," (ECF 53-1), does not comport with Local Civil Rule 15.1 and nevertheless fails to accurately present changes made from the SAC to the TAC, (id. at 8-9; ECF 56 at 5 n.3; ECF 57-2; ECF 57-3).

Plaintiff's opposition briefs do not address Defendants' allegations of procedural and factual deficiencies in her filing of the TAC, namely the "Amended Complaint Changes Shown in Bold."  Rather, she contends that compliance with Rule 8 is

case-specific and that dismissal for failure to comply with Rule 8 is rare.  (ECF 66 at 5-6; ECF 67 at 9-10).  Plaintiff further explains that the TAC is longer because she has included more precise facts, allegations have not been presented in chronological order in favor of an order Plaintiff believes to be more logical, and references to seemingly unrelated individuals and events seek to demonstrate an ongoing pattern of discriminatory conduct and potentially untimely allegations may nonetheless relate to the substance of the action.  (ECF 66 at 8-10).[5]

   The Court expresses its profound disappointment in Plaintiff's failure to heed its prior admonishment regarding proper pleading standards in federal court and the unnecessary complications such verbose and scattershot pleadings cause for the Court and the opposing parties.  As stated previously, Rule

---

[5] Plaintiff's opposition briefs heavily cite to certifications submitted by Plaintiff and counsel.  To the extent that these certifications supplement or clarify the TAC's allegations, the Court has not considered them in drafting this opinion.  See Perry v. Lee, No. 19-17899, 2020 WL 3396805, at *8 n.9 (D.N.J. June 19, 2020) (finding that claims made in a certification could not be considered as they were not raised in the amended complaint); see also Olson v. Ako, 724 F. App'x 160, 166 (3d Cir. 2018) ("[I]t is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" (quoting Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988))); Giles v. Phelan, Hallinan & Schmieg, L.L.P., 901 F. Supp. 2d 509, 520 (D.N.J. Sept. 28, 2012) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997))).

8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "[e]ach allegation . . . be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). "'Taken together,' Rules 8(a) and 8(d)(1) 'underscore the emphasis placed on clarity and brevity by the federal pleading rules,'" and a complaint may be dismissed for failure to follow these mandates. <u>See</u> <u>El Mujaddid v. Brewer</u>, 808 F. App'x 73, 76 (3d Cir. 2020) (quoting <u>In re Westinghouse Secs. Litig.</u>, 90 F.3d 696, 702 (3d Cir. 1996)); <u>Smith v. Director's Choice, LLP</u>, No. 15-81, 2016 WL 7165739, at *2 (D.N.J. July 28, 2016) (citing <u>In re Westinghouse Secs. Litig.</u>, 90 F.3d at 702).

The Federal Rules of Civil Procedure also empower courts to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." <u>See</u> Fed. R. Civ. P. 12(f). Motions to strike are intended "to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation," but are nonetheless generally disfavored. <u>See</u> <u>Corradetti v. Sanitary Landfill, Inc.</u>, 912 F. Supp. 2d 156, 164 (D.N.J. Dec. 7, 2012) (quoting <u>Garlanger v. Verbeke</u>, 223 F. Supp. 2d 596, 609 (D.N.J. Sept. 27, 2002)); <u>see also</u> <u>Burke v. Weight Watchers Int'l., Inc.</u>, 983 F. Supp. 2d 478, 484 (D.N.J.

19

Oct. 17, 2013) (noting that "[m]otions to strike 'usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case.'" (quoting Deery v. Crystal Instruments Corp., No. 13-198, 2013 WL 4517867, at *1 (D.N.J. Aug. 23, 2013))).

In lieu of full dismissal, Defendants ask the Court to strike portions of the Complaint including time-barred allegations and passages that make general and unsupported claims relating to TD's treatment of African American employees. (ECF 57-1 at 9-10). The Court declines to do so,[6] however, and will further decline to dismiss the TAC in full for failure to comply with Rule 8, preferring instead to proceed to the merits

---

[6] The Court has considered but ultimately determined not to strike at this time Plaintiff's allegations relating to a relationship of some kind between the Deerfield Township annual fair and the Ku Klux Klan set out in Paragraphs 34 to 38, 174, and 205 of the TAC. In addition to being well outside any statutory period as noted by Defendants, these allegations are distinguishable from other allegations within the TAC in that they imply racial animus by an entity other than TD. Moreover, the allegations are curiously vague as to what, if anything, Plaintiff told others at TD about the results of her internet search, the details of which are equally vague. (See ECF 53 at ¶ 36 (indicating that Plaintiff declined to support the Deerfield Township annual fair "[a]fter a long debate" without indicating who participated in the debate and what specifically was discussed)). While this Court will allow these allegations to stand for now, they serve as a prime of example of that lack of clarity and precision in the TAC. As set forth more fully above, if these allegations prove equally lacking in substance, the Defendants may revisit this issue and seek all appropriate remedies under the Federal Rules of Civil Procedure and Rules of Evidence.

of Plaintiff's claims.  See Freightmaster USA, LLC v. Fedex,
Inc., No. 14-3229, 2015 WL 1472665, at *3 (D.N.J. Mar. 31, 2015)
("[T]he Third Circuit has repeatedly stressed that there is a
'prefer[ence] that cases be adjudicated on the merits.'" (second
alteration in original) (quoting Catanzaro v. Fischer, 507 F.
App'x 162, 165 (3d Cir. 2014))).

    This decision should not be interpreted as the Court wholly
disagreeing with Defendants' thoughtful arguments or the Court
providing commentary on the general merits of the TAC.  To the
contrary, the Court agrees with Defendants in significant part –
particularly in the TAC's failure to heed much of the guidance
the Court sought to provide in its September 19, 2022 opinion.

    Lest the Court's original intent be misunderstood, it
dismissed the SAC and permitted amendment with anticipation that
the TAC would benefit all parties and the Court in clearly
defining the matters at issue.  The TAC, while somewhat
improved, still contains meaningful deficiencies identified in
the SAC – including significant amounts of extraneous
information that do not intuitively relate to each other or form
a consistently cogent narrative.  Upon review of the TAC, the
Court finds that Plaintiff herself would have benefitted from
the Court's instructions being kept closer in mind during
drafting.  It will nonetheless proceed to analyze Plaintiff's
claims as presented.  See Levy v. Jaguar Land Rover N. Am.,

LLC., No. 19-13497, 2020 WL 563637, at *3 (D.N.J. Feb. 4, 2020) (acknowledging that the complaint could have been streamlined but denying the defendant's motion to strike the complaint).

The decision not to strike in part or in whole is without prejudice to the many options available to the Defendants and this Court in properly framing the true scope of Plaintiff's claims and through the proper policing of discovery and application of the Rules of Evidence at trial separating the wheat from the chaff.  Such devices and remedies include other Federal Rules of Civil Procedure 12(e), 16, 33, 36, and ultimately 11.

The Court now turns to the substance of Defendants' motions to dismiss, addressing each count in turn.

**B. Plaintiff's CEPA Claim (Count 1)**

The "CEPA is remedial legislation and must therefore be construed liberally in employees' favor." Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 240 (3d Cir. 2016).  The CEPA prohibits retaliatory actions toward an employee who discloses or threatens to disclose to a supervisor an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation.  See N.J.S.A. 34:19-3(a)(1).

"Retaliatory action" as defined in the CEPA includes "the discharge, suspension or demotion of an employee," N.J.S.A.

34:19-2(e), while a supervisor is an individual who has the authority to direct and control the employee or remedy the alleged violation, N.J.S.A. 34:19-2(d). Thus, to state a CEPA claim, a plaintiff must show: "that (1) he reasonably believed defendants were violating a law, rule, or public policy; (2) that he performed a whistleblowing activity; (3) that an adverse employment action was taken against him; and (4) that a causal relationship exists between the whistleblowing activity and the adverse employment action." Puglia v. Elk Pipeline, Inc., 141 A.3d 1187, 1200 (N.J. 2016). The causal relationship requirement of the analysis may be satisfied by inferences drawn by the factfinder based on the surrounding circumstances of the adverse employment action with the temporal proximity between the protected conduct and adverse action providing support for such an inference. See Maimone v. City of Atl. City, 903 A.2d 1055, 1064 (N.J. 2006).

The CEPA applies to "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." See N.J.S.A. 34:19-2(a) (defining "Employer"). Therefore, "CEPA liability may attach to the employer by way of respondeat superior for the actions of its employees, and to individuals who perform retaliatory acts with the authorization of their employers."

23

Tonkinson v. Byrd, No. 1:17-cv-06162, 2018 WL 1919829, at *4
(D.N.J. Apr. 24, 2018) (citing Abbamont v. Piscataway Twp. Bd.
of Educ., 650 A.2d 958, 966 (N.J. 1994) and Ivan v. Cnty. of
Middlesex, 595 F. Supp. 2d 425, 478 (D.N.J. Jan. 21, 2009)).

Individual liability under the CEPA may attach to
individuals who take retaliatory actions within the scope of
their employment and may be extended to indirect supervisors and
coworkers who participate in the alleged retaliation.  See
Curley v. Mercury Ins. Servs., LLC, No. 21-12259, 2022 WL
445633, at *4 (D.N.J. Feb. 10, 2022).  CEPA claims brought
against individuals must "aver factual allegations that, if
accepted as true, could establish how each individual defendant
was personally liable for a CEPA violation."  McKenna v. Verint
Ams. Inc., No. 22-02370, 2022 WL 3211422, at *6 (D.N.J. Aug. 9,
2022) (quoting Brennan v. Palmieri, No. 07-4364, 2008 WL
5233782, at *6 (D.N.J. Dec. 12, 2008)).

Here, the Court finds little difficulty in concluding that
Plaintiff has adequately stated a CEPA claim against Carroll
and, by extension, TD.  Plaintiff alleges that she reported to
Carroll what she believed to be Lindner's violation of
Regulation Z of the Truth in Lending Act and Carroll terminated
Plaintiff a few weeks later.  See Gallagher v. Adamas Bldg.
Servs., No. 20-13926, 2022 WL 4115748, at *5 (D.N.J. Sept. 9,
2022) ("[T]he Court finds that the temporal proximity between

Plaintiff's conduct and the adverse employment action taken against him of days and weeks is unusually suggestive of retaliatory motive and thus a causal link may be inferred." (quoting Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 258 (3d Cir. 2014))).

Liability as to Lindner and Bechtel presents a somewhat thornier issue.  The TAC alleges that Lindner called Plaintiff and referenced his allegedly violative conduct shorty after her whistleblowing activity, (id. at ¶ 16), which Plaintiff asserts "demonstrat[es] that he had clearly been informed of the allegations against him and who had made them by Ms. Carroll," (ECF 66 at 35).  The TAC further alleges that "Defendant Bechtel is Defendant Carroll's supervisor.  He approved the lay off and termination of the Plaintiff."  (ECF 53 at C.1 ¶ 156). Defendants counter that Carroll, not Lindner, was responsible for terminating Plaintiff, (ECF 57-1 at 26), and that the TAC fails to allege that Bechtel was aware of Plaintiff's allegedly protected activity, (ECF 56 at 7-8).

Though the Court agrees that the TAC lacks specificity as to Lindner and Bechtel's personal involvement in Plaintiff's termination, it is reminded that "in CEPA cases, courts have recognized that, prior to discovery, 'a plaintiff cannot be expected to be privy to the inner workings' of the retaliatory actions and decisions individuals made against them."  Curley,

2022 WL 445633, at *5 (quoting <u>Southward v. Elizabeth Bd. of</u>
<u>Educ.</u>, No. 15-3699, 2017 WL 111924, at *10-11 (D.N.J. Jan. 11,
2017)); <u>see also</u> <u>Southward</u>, 2017 WL 111924, at *11 (finding
that, at the pleading stage, individual liability may have been
sufficiently alleged by claiming that the board met, discussed,
and voted to terminate the plaintiff and that "[o]nce discovery
has been had, [the plaintiff] will be held to the requirement of
demonstrating the kind of personal involvement that would
render <u>each</u> individual defendant liable").  The Court will
therefore deny Defendants' motions to dismiss as to Count 1 of
the TAC and permit Plaintiff's CEPA claim to proceed to
discovery.

**C. Plaintiff's NJLAD Claims (Counts 2, 3, 5, 6, 7)**

The NJLAD makes it unlawful for an employer "to refuse to
hire or employ or to bar or to discharge or require to retire .
. . from employment such individual or to discriminate against
such individual in compensation or in terms, conditions or
privileges of employment" because of race or age.  N.J.S.A.
10:5-12(a).  "Employer" as it is defined in the NJLAD refers to
the statute's definition of "Person" which includes "one or more
individuals, partnerships, associations, organizations, labor
organizations, corporations, legal representatives, trustees,
trustees in bankruptcy, receivers, and fiduciaries."  N.J.S.A.
10:5-5(a), (e).  The New Jersey Supreme Court has stated that

26

"[u]nder a plain reading of these definitions an individual supervisor is not defined as an 'employer' under the [NJLAD]." Tarr v. Ciasulli, 853 A.2d 921, 928 (N.J. 2004); see also Fado v. Kimber Mfg., Inc., No. 11-cv-4772, 2016 WL 3912852, at *8 (D.N.J. July 18, 2016) (citing Tarr and noting that "employer" under the NJLAD does not include individual supervisors or coworkers, but rather such individuals may only be liable as aiders and abettors).

As a preliminary matter, Defendants contend that Counts 2 and 3 as to Carroll, Lindner, and Bechtel and Count 5 as to Carroll must be dismissed because the individual Defendants were not Plaintiff's employer as defined by the NJLAD. (ECF 56 at 9-10; ECF 57-1 at 12). Plaintiff responds, at least with respect to Bechtel, that such arguments are without merit because "Defendant Bechtel binds the employer as a manager through agency theories of vicarious liability, respondeat superior and the cat's paw theory" and that "[d]ue to his position he is the employer under the law." (ECF 67 at 15). Plaintiff offers no authority to support these assertions or to rebut the clear guidance provided by the New Jersey Supreme Court. Therefore, the Court will dismiss Counts 2, 3, and 5 as to Carroll, Lindner, and Bechtel because they were supervisors at TD, (ECF 53 at ¶ 9), and therefore not Plaintiff's employers under the NJLAD. See Lewis v. Brett DiNovi and Assocs., LLC, No. 22-

06275, 2023 WL 3993759, at *1 (D.N.J. June 14, 2023) (granting dismissal as to individual defendants).

The Court further recognizes at the outset that a two-year statute of limitations applies to NJLAD claims subject to the continuing violation doctrine, which treats a series of separate acts as a collective employment practice for which the statute of limitations does not begin to run until the final act occurs. See Schiavo v. Marina Dist. Dev. Co., LLC, 123 A.3d 272, 286-87 (N.J. Super. Ct. App. Div. 2015). The doctrine does not apply, however, to discrete acts such as terminations, transfers, or promotion denials – which may be time-barred even if they relate to timely claims. See Williams v. Twp. of Lakewood, No. 17-cv-11401, 2020 WL 7391009, at *12 (D.N.J. Dec. 15, 2020).

Therefore, while Plaintiff asserts that the continuing violation doctrine resuscitates thirteen years of allegations, including failures to promote, transfers, and pay decreases, (ECF 66 at 11-15), the Court holds here that discrete acts that fall outside the NJLAD's two-year statute of limitations remain untimely, see Smith v. Twp. of East Greenwich, 519 F. Supp. 2d 493, 505-06 (D.N.J. Oct. 30, 2007) (concluding that the continuing violation doctrine could not save the plaintiff's untimely failure-to-promote and discriminatory discipline claims); see also Thompson v. Anthem Cos., Inc., No. 18-6676, 2019 WL 2591100, at *4 (D.N.J. June 7, 2019) ("The Third Circuit

28

has found that each type of act Plaintiff alleges – demotions, changes in work schedule, unwarranted disciplinary actions, and assignments of excessive work – constitutes a discrete act from which the statute of limitations commences." (citing Sgro v. Bloomberg L.P., 331 F. App'x 932, 938 (3d Cir. 2009) and O'Connor v. City of Newark, 440 F.3d 125, 126 n.1, 128 (3d Cir. 2006))).[7]

### 1. Race and Age Discrimination (Count 2 and 5)

To state a prima facie claim of racial discrimination or disparate treatment under the NJLAD, a plaintiff must show that: (1) they belong to a protected class, (2) they held or applied for a job for which they were objectively qualified, (3) they were terminated or not hired, and (4) the employer sought to or did fill the position with a person of similar qualifications. Tegler v. Global Spectrum, 291 F. Supp. 3d 565, 582 (D.N.J. Feb. 14, 2018) (citing Viscik v. Fowler Equipment Co., 800 A.2d 826 (N.J. 2002)).

For the purposes of Count 2, the Court focuses on Plaintiff's termination as other actions alleged, such as

---

[7] The Court acknowledges that a statute-of-limitations defense must generally be pled as part of an answer rather than asserted in a motion to dismiss.  However, such defenses may be raised in a Rule 12(b)(6) motion when "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."  See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (quoting Robinson v. Johnson, 313 F.3d 128, 134–35 (3d Cir. 2002)).

transfers and failures to promote, represent discrete and untimely actions as described above.  See Smith, 519 F. Supp. 2d at 505-06.  Defendants argue that Plaintiff has failed to offer facts supporting an inference that her termination was related to race as opposed to whistleblowing and that statements made about the treatment of Caucasian counterparts are overly generalized.  (ECF 57-1 at 17-18).  Plaintiff, on the other hand, claims that she was discriminated against due to her race and retaliated against due to her whistleblowing activity.  (ECF 66 at 22).[8]

Defendants are correct that the TAC attributes Plaintiff's termination to her whistleblowing activity.  However, the Court finds that the pleading standard of Federal Rule of Civil Procedure Rule 8 permits Plaintiff to alternatively attribute her termination to whistleblowing and racial discrimination at

---

[8] Plaintiff's opposition to dismissal of Counts 2 and 5 asserts that she was retaliated against due to her "raising an issue that was against the law" and refers to the standard applicable to disparate-impact claims.  (ECF 66 at 12-13, 19, 22).  Count 2 does not assert a disparate-impact claim, (ECF 53 at C.2 ¶¶ 166-85), and Count 5 expressly claims discrimination and disparate treatment and only generally alleges that TD's "policies, practices, and/or procedures have produced a disparate impact against Plaintiff with respect to the terms and conditions of her employment," (id. at ¶¶ C.5 212-225).  Further, to the extent that Plaintiff refers to her whistleblowing activity, the Court finds that such activity is not relevant to her NJLAD claims because, to be protected under the NJLAD, "an employee's complaint 'must concern discrimination.'"  See Cohen v. BH Media Grp., Inc., 419 F. Supp. 3d 831, 861 (D.N.J. Nov. 14, 2019) (quoting Dunkley v. S. Coraluzzo Petroleum Transporters, 98 A.3d 1202, 1208 (N.J. Super. Ct. App. Div. 2014)).

the present stage.  See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); see also Marrin v. Cap. Health Sys., Inc., No. 14-2558, 2017 WL 3086370, at *6 (D.N.J. July 20, 2017) ("Courts in this district have persuasively held that, given Rule 8's pleading standard, plaintiffs are not required to choose between their CEPA and NJLAD retaliation claims until after the close of discovery."); Rossi v. Vericare Mgmt., Inc., No. 13-6884, 2016 WL 6892075, at *4 (D.N.J. Nov. 22, 2016) ("I predict that the New Jersey Supreme Court would hold that the CEPA waiver provision does not require a plaintiff to elect his remedies until after the completion of discovery.").  In so concluding, the Court notes that – at least in the context of her termination – Plaintiff's CEPA and NJLAD claims assert distinct causes for the same ultimate result.

Reading the TAC in the light most favorable to Plaintiff, the Court finds that Plaintiff is of a protected class, held a job for which she was qualified, and was terminated.  As for the final prong of the analysis, the TAC alleges that Plaintiff was purportedly terminated because a senior project manager was needed to handle projects, specifically the creation of customer surveys, and that Caucasian employees who had failed to complete the survey project prior to Plaintiff's attempt were not terminated.  (ECF 53 at C.2 ¶¶ 180, 183).  This Court has found

the fourth prong of be adequately pled when a plaintiff has been terminated while similarly situated individuals outside of the plaintiff's protected class and with comparable performance records have not been terminated.  See Taylor v. Amcor Flexibles Inc., 669 F. Supp. 2d 501, 506-07 (D.N.J. Nov. 4, 2009).  The Court will therefore deny Defendants' motion to dismiss Count 2 of the TAC to the extent that it applies to TD and Plaintiff's termination.

The Court arrives at the contrary conclusion as to Count 5 and Plaintiff's age-discrimination claim.  Like race discrimination, a claim for age discrimination under the NJLAD requires that the plaintiff be: (1) a member of a protected class, (2) qualified for the position from which they were discharged, (3) terminated from the position, and (4) replaced with a younger individual.  Tegler, 291 F. Supp. 3d at 594.  Unlike its federal analogue, the Age Discrimination in Employment Act, the NJLAD does not limit its protections to those over the age of forty.  Wright v. L-3 Commc'ns Corp., 227 F. Supp. 2d 293, 298 (D.N.J. Oct. 21, 2002).

The TAC dedicates hundreds of paragraphs to Defendants' alleged racial discrimination, harassment, and animus, but there is virtually no reference to Plaintiff's age or related discrimination or disparate treatment until Plaintiff recites the necessary elements to state a claim under Count 5.

Plaintiff alleges that she was removed from managing a training bootcamp in January 2018 and was replaced by a less qualified – though not expressly younger – Caucasian male, Matt Buganza. (ECF 53 at ¶ 141).  Only later does Plaintiff allege that she was removed in favor of a younger employee – this time alleging that that employee was Carroll.  (Id. at C.5 ¶ 216).  To the extent that this allegation represents a kind of demotion, Plaintiff's claim is untimely, see Thompson, 2019 WL 2591100, at *4, and to the extent that it represents a mere reassignment, Plaintiff provides no additional detail or context to demonstrate that it constituted an adverse action under the NJLAD, see Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd., 704 F. App'x 164, 168-69 (3d Cir. 2017) (affirming summary judgment, in part, because the plaintiff failed to offer evidence of how his reassignment caused a significant change in his employment status).

The TAC also generally states that Defendants did not terminate younger members of Plaintiff's work group, (ECF 53 at C.5 ¶ 215), and her opposition claims that she "believe[s] a younger person was placed in her position after she was terminated," (ECF 66 at 22).  To the extent that these allegations are not contained in the TAC, they are not properly before the Court.  See Olson, 724 F. App'x at 166.  As pled, and contrary to Plaintiff's racial-discrimination claim which

33

provides addition details as to alleged harassment Plaintiff
faced and coworkers who worked on the same project as Plaintiff
and were not fired, Plaintiff here does not provide sufficient
detail for the Court to conclude that younger team members were
similarly situated to Plaintiff in the context of her
termination, see Brown v. Sysco Food Servs. of Metro N.Y. LLC,
No. 14-474, 2014 WL 2566145, at *6 (D.N.J. June 6, 2014) (noting
that there is no "there is no bright-line rule for determining
who is a 'similarly situated' employee" and that courts,
instead, "make a sensitive appraisal in each case to determine
the most relevant criteria." (quoting Jason v. Showboat Hotel &
Casino, 747 A.2d 802, 807 (N.J. Super. Ct. App. Div. 2000) and
then Peper v. Princeton Univ. Bd. of Trs., 389 A.2d 465, 480
(N.J. 1978))), or that discovery will lead to the discovery of
the elements necessary to state a claim of age discrimination,
see Mutazz, 2022 WL 2713974, at *4.  Count 5 of the TAC will
thus be dismissed in its entirety.

### 2. Hostile Work Environment (Count 3)

Count 3 of the TAC asserts a hostile-work-environment
claim.  To state such a claim, Plaintiff must show that: "'the
defendant's conduct (1) would not have occurred but for the
employee's race; and the conduct was (2) severe or pervasive
enough to make a (3) reasonable African American believe that
(4) the conditions of employment are altered and the working

environment is hostile or abusive.'"  Nuness v. Simon and
Schuster, Inc., 221 F. Supp. 3d 596, 601 (D.N.J. Nov. 17, 2016)
(quoting Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir.
2005)).  Claims of hostile work environments differ from those
concerning discrete discriminatory acts as they are "are based
on the cumulative effect of [the] individual acts," Cutler v.
Dorn, 955 A.2d 917, 924-25 (N.J. 2008) (alteration in original)
(quoting Green v. Jersey City Bd. of Educ., 828 A.2d 883 (N.J.
2003)), and thus the "severe or pervasive" prong may be
satisfied by evaluating the cumulative effect of a series of
incidents, any one of which may itself be insufficient to
sustain a claim, id. at 925 (citing Lehmann v. Toys 'R' Us,
Inc., 626 A.2d 445 (N.J. 1993)).

The statute of limitations also differs as, while the two-
year statutory period begins to run on a discrete act on the day
in which it occurs, for a plaintiff who has "alleged a pattern
or series of acts, any one of which may not be actionable as a
discrete act, but when viewed cumulatively constitute a hostile
work environment," their action begins to run on the date of the
final act, even if some of the relevant acts fall outside the
statutory period.  See Fujita v. Yamanashi, No. A-0706-
14T2, 2015 WL 10354550, at *3 (N.J. Super. Ct. App. Div. Feb.
25, 2016) (quoting Shepherd v. Hunterdon Developmental Ctr., 803
A.2d 611, 623 (N.J. 2002)).  Courts evaluating alleged claims of

hostile work environment consider "'all the circumstances,'
including 'the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating,
or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance.'" Cutler, 955
A.2d at 925 (quoting Green, 828 A.2d at 891).

Defendants contend that many of the actions complained of
fall outside the statutory period and, even if true, were not
based on Plaintiff's race and were not severe or pervasive
enough as to alter the conditions of her employment. (ECF 57-1
at 20-24). Plaintiff meanwhile asserts that hostile-work-
environment claims do not begin to accrue until the date of the
final act and her allegations of being singled-out and called
names, losing salary, and the like are – in the aggregate –
sufficient to avoid dismissal of her hostile-work-environment
claim. (ECF 66 at 14, 25-27). The Court agrees in part.

To be sure, as stated above, the TAC improperly seeks to
revive discrete and untimely acts such as failures to promote,
salary decreases, and burdensome assignments. See Thompson,
2019 WL 2591100, at *4 (dismissing the plaintiff's hostile-work-
environment claim as the complained-of actions, including
demotions, unwarranted discipline, and assignment of excessive
work, constituted discrete actions for which the statute of
limitations had run). Plaintiff also seeks to incorporate the

alleged treatment faced by other African American employees,
TD's practices in low-income areas, and TD's involvement in the
Deerfield Township annual fair, (ECF 66 at 14-15), without any
clear and direct ties to her employment – presumably for the
purpose of making general allegations as to Defendants' alleged
racial animus.  Despite these deficiencies, the Court cannot
conclude at this stage that Plaintiff has wholly failed to state
a hostile-work-environment claim based on the cumulative effect
of allegations including that her office was moved, she was
required to place her available hours in her email signature,
she was generally excluded from relevant meetings, and the like.
See Fox v. DGMB Casino, LLC, A-3947-18T2, 2020 WL 4745281, at
*6-7 (N.J. Super. Ct. App. Div. Aug. 17, 2020) (reversing
dismissal of the plaintiff's hostile-work-environment claim when
the plaintiff alleged, in part, that she lost the ability to
hire staff, had her parking space moved to a less secure area,
and faced increased supervision despite no disciplinary record).

The Court is particularly persuaded that dismissal is
inappropriate based on the allegation that Plaintiff was
repeatedly referred to as "aggressive," "not a team player," and
a "lone wolf."  (ECF 53 at ¶¶ 41, 54, 76-78, 81).  As stated in
the TAC, referring to African American women as aggressive in
their work is a familiar racial stereotype, (id. at ¶ 78), and
at least one recent opinion within the Third Circuit has

recognized the "perniciousness" of the "the 'angry Black woman' trope" in the context of a 42 U.S.C. § 1981 retaliation claim. See Curry v. Devereux Found., 541 F. Supp. 3d 555, 561 (E.D. Pa. May 24, 2021); see also Roa v. Roa, 985 A.2d 1225, 1232 (N.J. 2010) (noting that the New Jersey Supreme Court "look[s] to federal case law as a 'key source of interpretative authority' in connection with the" NJLAD (quoting Lehmann, 626 A.2d at 452)).  The court in Curry concluded that African American women endeavoring to avoid such stereotyping may adopt passive behaviors that in turn inhibit their ability to advance their careers or object to discrimination.  541 F. Supp. 3d at 561.

Though Curry involved an express statement that "[p]eople are afraid of the angry Black woman," id. at 558, and is not binding on this Court, the Court is unconvinced that its persuasive reasoning is not equally applicable in the present matter.  Plaintiff's hostile-work-environment claim may not ultimately succeed at summary judgment or trial, but the Court concludes that dismissal at this stage would be premature.  The Court will thus deny Defendants' motion to dismiss Count 3 as it relates to TD.

### 3. Failure to Promote (Count 7)

In Count 7, Plaintiff brings racial discrimination and disparate treatment and impact claims premised on failure to promote.  A plaintiff alleging failure to promote must

38

demonstrate that (1) they are within a protected class, (2)
sought and were qualified for a promotion, (3) were rejected for
the promotion, and (4) nonmembers of the protected class were
treated more favorably – meaning that an individual of equal or
lesser qualifications outside of the protected class was given
the promotion.  Smith, 519 F. Supp. 2d at 506 (citing Rogers v.
Alternative Res. Corp., 440 F. Supp. 2d 366, 371 (D.N.J. July
27, 2006)).  Claims of disparate impact, meanwhile, require that
a plaintiff "show that a facially neutral policy 'resulted in a
significantly disproportionate or adverse impact on members of
the affected class.'"  Schiavo, 123 A.3d at 285 (quoting Gerety
v. Atl. City Hilton Casino Resort, 877 A.2d 1233, 1238 (N.J.
2005)).

    Defendants argue that the TAC fails to identify a facially
neutral policy to support Plaintiff's disparate-impact claim or
a position for which she was qualified, applied, and rejected
for discriminatory reasons.  (ECF 57-1 at 15-16).  Plaintiff,
perhaps sensing that at least some of her failure-to-promote
claims are time-barred, argues that she is African American and
was denied promotion and transfer opportunities during her final
two years of employment,[9] was not given an increase in title or

---

[9] Plaintiff appears to assert that the relevant two-year period
for the purpose of the NJLAD's statute of limitations is the two
years preceding her termination.  The relevant period is in fact
the two years preceding her filing of the complaint.  See Toto

salary, and that any failure to apply for a promotion is not dispositive of her claim.  (ECF 66 at 18-19).

Sifting through the TAC, the Court acknowledges that Plaintiff alleges generally that "[b]ased on information and belief, it was generally known that African American people are not promoted into high level positions at" [TD].  (ECF 53 at ¶ 176).  Plaintiff makes minimal effort, however, to expound upon this claim and fails to identify any policy – neutral or otherwise – that she alleges has resulted in a racially disparate impact in promotions at TD.  The Court will therefore dismiss Plaintiff's claim for disparate impact.

The Court will also dismiss Plaintiff's failure-to-promote claim.  The TAC alleges specific instances of failure to promote or transfer including the lack of promotion offered to her following the Philadelphia meeting in July 2008 and the ultimate denial of her move to Risk Management in 2015, purportedly due to the value of Plaintiff's institutional knowledge.  (Id. at ¶¶ 74, 110-11).  To the extent that either of these instances may have been actionable, Plaintiff seems to correctly acknowledge that they are untimely.  See Henry v. N.J.  Dep't of Hum. Servs., 9 A.3d 882, 890-91 (N.J. 2010) (discussing Roa and

_____

v. Princeton Twp., 962 A.2d 1150, 1155 (N.J. Super. Ct. App. Div. 2009) (concluding that the plaintiff's hostile-work-environment claim was time-barred as his complaint was filed more than two years following the final alleged act of harassment).

noting that claims of discrete actions, such as failure to promote, must be filed within two years of their occurrence).

Plaintiff attempts to maintain her claim by relying on Rogers for the proposition that it was not necessary for her to apply to a particular position.  (ECF 66 at 18).  Rogers, however, is distinguishable in that the plaintiff there claimed that the position sought had no formal application process but that he expressed his interest to his supervisor.  440 F. Supp. 2d at 371-72.  The court – relying in part on a Third Circuit decision indicating "that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of [discrimination], as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer" – concluded that the plaintiff sufficiently demonstrated that he sought the position.  Id. at 372 (alteration in original) (quoting E.E.O.C. v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990)).  The court nonetheless ultimately concluded that the plaintiff failed to demonstrate that he was rejected for the promotion.  Id.

Here, Plaintiff has not identified any specific position she sought during the statutory period, let alone that she expressed interested in it to a supervisor and was ultimately rejected.  The Court therefore holds that Rogers is inapposite and will dismiss Plaintiff's failure-to-promote claim.

41

### 4. Aiding and Abetting (Count 6)

Having concluded that Counts 2 and 3 claiming discrimination and hostile work environment will survive dismissal in part, the Court will consider Plaintiff's claim alleging aiding-and-abetting liability as to Carroll, Lindner, and Bechtel.  The NJLAD makes it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."  N.J.S.A. 10:5-12(e).  As stated, an individual may only be liable under the NJLAD as an aider or abettor and to prove such a claim,

> Plaintiff must show (1) the party whom the defendant aided performed a wrongful act causing an injury; (2) the defendant was generally aware of his role as part of an overall illegal or tortious activity at the time that he provided the assistance; and (3) the defendant knowingly and substantially assisted the principal violation.
>
> Lopez v. Lopez, 997 F. Supp. 2d 256, 276 (D.N.J. Feb. 4, 2014) (citing Cicchetti v. Morris Cnty. Sheriff's Off., 947 A.2d 626, 645 (N.J. 2008) and Hurley v. Atl. City Police Dep't, 174 F.3d 95, 127 (3d Cir. 1999)).

Whether substantial assistance has been provided is determined by analyzing: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor."  See Tarr, 853 A.2d at

929.  A supervisor may be liable based on "active and purposeful conduct" or by acting with deliberate indifference.  George v. Bd. of Educ. of the Twp. of Millburn, 34 F. Supp. 3d 442, 459 (D.N.J. July 23, 2014) (quoting Tarr, 853 A.2d at 929 and discussing the NJLAD in the education context).  Liability is construed broadly and supervisors may be found liable for aiding and abetting their own conduct.  See O'Toole v. Tofutti Brands, Inc., 203 F. Supp. 3d 458, 467-68 (D.N.J. Aug. 26, 2016) (collecting cases).

Defendants argue that Plaintiff's termination is the only potentially actionable claim pled and that the TAC fails to allege that Lindner or Bechtel knowingly provided substantial assistance.  (ECF 56 at 10-11; ECF 57-1 at 24-25).  Plaintiff seems to focus her arguments on theories of respondeat superior and vicarious liability, that Carroll, Lindner, and Bechtel "were her supervisors and managers, and they bind the employer." (ECF 66 at 31-34; ECF 67 at 24).  The Court, respectfully, does not follow this argument as it appears to focus on liability as to the employer (TD) as opposed to the employees (Carroll, Lindner, and Bechtel).

The TAC provides some additional guidance.  Specifically, it states that Carroll was the one to terminate Plaintiff.  (ECF 53 at C.6 ¶ 219).  Because the Court has declined to dismiss Count 2 based on Plaintiff's termination, it will further

decline to dismiss Plaintiff's aiding-and-abetting claim as to Carroll with respect to the same conduct.  See O'Toole, 203 F. Supp. 3d at 467-68.

The TAC goes on to allege that Lindner and Bechtel were also involved in Plaintiff's termination "[b]ased on information and belief" and that all three individual Defendants racially harassed and discriminated against Plaintiff and knew of unlawful behavior and failed to remediate.  (ECF 53 at C.6 ¶¶ 229, 231-232).  The TAC provides no detail whatsoever of Lindner or Bechtel actively and purposefully assisting in race-based discrimination of Plaintiff.  The TAC's allegation as to Lindner focus on his alleged violation of the Truth in Lending Act, repeated phone calls to Plaintiff following her termination, and criticism of work he allegedly instructed Plaintiff to perform. (Id. at ¶¶ 14, 16, 21, 24).  Bechtel purportedly had a reputation of being "a bully," embarrassed Plaintiff during a sales conference in Atlantic City by confronting her about a project in front of a vendor, and was dissatisfied with Plaintiff's recommendation to not move forward with the survey project.  (Id. at ¶¶ 26, 149, 153-54).

The Court interprets these claims as alleging that Lindner and Bechtel acted with deliberate indifference to the discrimination and harassment that Plaintiff allegedly faced. See George, 34 F. Supp. 3d at 459.  However, the facts as pled

do not offer a basis for the Court to conclude that Lindner or
Bechtel provided "knowing and substantial assistance" to the
principal alleged discrimination and harassment or anticipation
that evidence of such may be uncovered through discovery.  See
Lopez-Arenas v. Zisa, No. 10-2668, 2012 WL 933251, at *10-11
(D.N.J. Mar. 19, 2012) (distinguishing between one of the
plaintiff's superiors, for whom allegations were sufficient
based on claims of intimidation and efforts to discourage
Plaintiff from seeking statutorily guaranteed compensation and
benefits, and two others who the plaintiff insufficiently
alleged breached their duty and had knowledge of actions
violative of the plaintiff's rights).  Plaintiff' aiding-and-
abetting claim as to Lindner and Bechtel will therefore be
dismissed.[10]

### D. Plaintiff's IIED Claim (Count 4)

An IIED claim under New Jersey law consists of four
elements: (1) intentional or reckless conduct on the part of
defendant (2) that is so "extreme and outrageous . . . as to go
beyond all possible bounds of decency, and to be regarded as

---

[10] The Court acknowledges what might be perceived as an
incongruity in its holdings relating to individual liability
under the CEPA and NJLAD.  It concludes, however, that the CEPA
and NJLAD offer distinct theories of individual liability –
particularly with aiding-and-abetting being unique to the NJLAD
while the CEPA itself creates a cause of action for individual
defendants – and therefore divergent holdings may be expected.
See Espinosa v. Cnty. of Union, No. 01-CV-3655, 2005 WL 2089916,
at *10 (D.N.J. Aug. 30, 2005).

atrocious, and utterly intolerable in a civilized community,"
(3) proximate cause, and (4) distress that "is 'so severe that
no reasonable man could be expected to endure it.'" Juzwiak v.
Doe, 2 A.3d 428, 433 (N.J. Super. Ct. App. Div. 2010) (omission
in original) (quoting Buckley v. Trenton Saving Fund Soc'y, 544
A.2d 857, 863 (N.J. 1988)).  IIED claims are subject to a two-
year statute of limitations.  N.J.S.A. 2A:14-2(a); Campanello v.
Port Auth. of N.Y. & N.J., 590 F. Supp. 2d 694, 699 (D.N.J. Dec.
19, 2008).  Like NJLAD claims, the continuing violation doctrine
may be applied to IIED claims.  Hollingsworth v. Port Auth. of
N.Y. and N.J., No. 06-571, 2009 WL 1702293, at *5 (D.N.J. June
16, 2009).

Defendants argue that employment actions seldom reach the
level of outrageousness necessary to sustain an IIED claim and
that Plaintiff's allegations here fail to clear that threshold
and are nonetheless untimely and preempted by Plaintiff's NJLAD
claims.  (ECF 56 at 11-12; ECF 57-1 at 26-27).  Plaintiff
responds that she has suffered from anxiety and post-traumatic
stress disorder and that Defendants' actions – in their totality
– are sufficiently egregious to make out an IIED claim.  (ECF 66
at 37-38).

The Court first addresses Defendant's preemption argument.
"Because of the broad availability of remedies under the
[NJLAD], both state and federal courts in New Jersey have

46

frequently held that the [NJLAD] bars common law claims based on the same operative facts as underlie the [NJLAD] claim." Everson v. JPMorgan Chase Bank, No. 12-07288, 2013 WL 1934666, at *2, 4 (D.N.J. May 8, 2013) (collecting cases and granting dismissal upon finding that the plaintiff's IIED claim was duplicative of her NJLAD claim); see also Belfort v. Morgan Props., LLC, No. 16-5207, 2018 WL 3201787, at *10-11 (D.N.J. June 29, 2018) (granting summary judgment as to the plaintiff's IIED claim because it was based on the same underlying facts as his hostile-work-environment claim); Page v. Payless ShoeSource, Inc., No. 10-2793, 2012 WL 28786, at *7 (D.N.J. Jan. 5, 2012) ("Although the New Jersey Supreme Court has not spoken on the issue, numerous courts have held that a plaintiff's common law claim is preempted when the conduct underlying that claim is the same conduct at issue in the plaintiff's [NJLAD] claim.").

The TAC bases Plaintiff's IIED claim on the racial harassment and discrimination she allegedly suffered, including failures to promote, lost salary, and her termination.  (ECF 53 at C.4 ¶ 205).  The Court is thus persuaded that Plaintiff's IIED claim is premised on the same conduct that serves as the basis of her NJLAD claims and is thus preempted.

Even if the Court were to find that Plaintiffs' IIED claim is not preempted, it is reminded that "it is extremely rare to find conduct in the employment context that will rise to the

level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." See Polonsky v. Verizon Commc'ns, Corp., No. 09-4756, 2011 WL 5869585, at *16 (D.N.J. Nov. 22, 2011) (quoting Griffin v. Tops Appliance City, Inc., 766 A.2d 292, 297 (N.J. Super. Ct. App. Div. 2001)).  While the Court has held that Plaintiff's allegations are sufficient to sustain some of her statutory claims, it does not follow that those same allegations support her IIED count.  See Torres v. The Home Depot, Inc., No. 10-3152, 2011 WL 114831, at *2 (D.N.J. Jan. 13, 2011) (dismissing the plaintiff's IIED claim premised on being ordered to perform menial and demeaning work in the presence of his subordinates); Kee v. Camden Cnty., No. 04-0842, 2006 WL 2827733, at *6 (D.N.J. Sept. 28, 2006) ("Plaintiff has not alleged anything other than racial discrimination which, without more, is actionable as intentional infliction of emotional distress only if the Defendants' actions were utterly intolerable."); Griffin, 766 A.2d at 297 (collecting cases and noting that IIED claims have been rejected when their bases have included denial of promotions and termination based on age).  The Court will therefore dismiss Count 4 of the TAC as to all Defendants.

**E. Plaintiff's Wrongful Termination Claim (Count 8)**

Plaintiff' final substantive claim is common-law wrongful

termination.  Count 8 alleges that Plaintiff was informed that she was terminated due to the need to hire a senior project manager for the survey project; that that rationale is contrary to information she received concerning where project managers were to work; and that she was nonetheless assigned a significant project that others were unable to accomplish, was outside her training, and for which she was not provided support.  (ECF 53 at C.8 ¶¶ 255-269, 278-81).

The Court recognizes at the outset that employment in New Jersey is presumptively at-will and is "terminable by either employer or employee 'unless an agreement exists that provides otherwise.'"  McCrone v. Acme Markets, 561 F. App'x 169, 172 (3d Cir. 2014) (quoting Witkowski v. Thomas J. Lipton, Inc., 643 A.2d 546, 552 (N.J. 1994)).  Therefore, an employee may be terminated "for good reason, bad reason, or no reason at all."  Id. (quoting Witkowski, 643 A.2d at 552).

The TAC does not identify any agreement prohibiting Plaintiff's termination.  See Hamza v. United Cont'l Holdings, LLC, No. 19-8971, 2020 WL 5757807, at *6 (D.N.J. Sept. 28, 2020) ("Plaintiff does not suggest that his termination was contrary to any employment agreement with United and, therefore, United was permitted to terminate Plaintiff's employment for any legal reason.").  Likewise, Plaintiff's performance record does not render her termination unlawful.  Id.

The Court reads Plaintiff's opposition brief as focusing on whether she may assert a wrongful-termination claim, not whether the TAC adequately articulates one.[11]  Plaintiff further contends that at-will employment is inapplicable when an individual is terminated contrary to law or public policy, including discrimination and for engaging in protected actions.  (ECF 66 at 39-40).  The Court finds that such an argument contradicts Plaintiff's assertion that her wrongful-termination and statutory claims "are different claims based on several different factual theories," (id. at 38), and agrees with Defendants that Plaintiff's wrongful-termination claim is barred to the extent that it is premised on alleged racial discrimination or retaliation for whistleblowing, see Rodridguez v. Ready Pac Produce, No. 13-4634, 2014 WL 1875261, at *11 (D.N.J. May 9, 2014) ("While causes of action that are independent from CEPA claims are not waived, 'causes of action that are directly related to the employee's termination due to disclosure of the employer's wrongdoing' fall within CEPA's

---

[11] Plaintiff relies heavily on the Appellate Division's decision in Calabotta v. Phibro Animal Health Corp., 213 A.3d 210 (N.J. Super. Ct. App. Div. 2019), stating that "since it was decided [in Calabotta] that New Jersey law applies, it was then decided that the NJLAD claim, and wrongful termination claim apply as well."  (ECF 66 at 38-39).  To the contrary, Calabotta involved NJLAD claims and the Appellate Division remanded the plaintiff's wrongful-termination claim for additional development of the record to determine whether New Jersey or Illinois law applied. See 213 A.3d at 216, 229-30.

waiver provision." (quoting <u>Ivan</u>, 595 F. Supp. 2d at 465));
<u>Davis v. Supervalu, Inc.</u>, No. 13-414, 2013 WL 1704295, at *5
(D.N.J. Apr. 19, 2013) ("To the extent Plaintiff claims her
discharge violated public policy because she was discriminated
against by the Defendant, this claim is preempted by the NJLAD.
Under New Jersey law, a 'common law claim for wrongful
termination is not viable insofar as it seeks the same remedy
available under the NJLAD.'" (quoting <u>Kapossy v. McGraw-Hill,
Inc.</u>, 921 F. Supp. 234, 249 (D.N.J. Mar. 21, 1996))).

The Court telegraphed this decision when it cautioned
Plaintiff to be judicious in drafting the TAC and that "to the
extent that Plaintiff pleads a count for wrongful termination
along with NJLAD counts where the counts are based on the same
factual predicate, the wrongful termination count will be
preempted by the NJLAD counts."  (ECF 49 at 11 n.3 (citing <u>Shinn
v. FedEx Freight, Inc.</u>, No. 1:16-cv-777, 2018 WL 4275993, at *10
(D.N.J. Sept. 7, 2018)).

Plaintiff does not identify any separate law or policy
violated by her termination.  Count 8 will therefore be
dismissed as to all Defendants.  <u>See</u> <u>Powell v. Advancing
Opportunities</u>, No. 22-00525, 2022 WL 16961387, at *3-4 (D.N.J.
Nov. 16, 2022) (dismissing the plaintiff's wrongful-termination
claim for failure to identify a violated public policy).

## IV. Conclusion

For the reasons stated above, Defendants' motions to dismiss, (ECF 56; ECF 57), will each be granted in part and denied in part.  To summarize, dismissal of Count 1 will be denied in full, dismissal of Count 2 will be granted in part and denied to the extent that it seeks relief from TD relating to Plaintiff's termination, dismissal of Count 3 will be granted in part and denied to the extent that it seeks relief from TD, dismissal of Count 4 will be granted in full, dismissal of Count 5 will be granted in full, dismissal of Count 6 will be granted as to Lindner and Bechtel and denied as to Carroll, dismissal of Count 7 will be granted in full, and dismissal of Count 8 will be granted in full.

The parties will be Ordered to file a Disclosure Statement indicating their citizenship for the purposes of diversity within fourteen days of the date of this Opinion.

An Order consistent with this Opinion will be entered.


Date: July 19, 2023                    s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.